[744 NYS2d 130]

CAMPAIGN FOR FISCAL EQUITY, INC., et al., Respondents, v STATE OF NEW YORK et al., Appellants.

First Department, June 25, 2002

**APPEARANCES OF COUNSEL**

*Joseph F. Wayland* and *Michael A. Rebell* of counsel (*David E. Massengill, William T. Russell, Jr., Kenneth G. Crowley, Jonathan K. Youngwood, Daniel H. Tabak, Elaine M. Divelbliss, Nihara K. Choudhri, Jason S. Stone* and *Molly A. Hunter* on the brief; *Simpson Thacher & Bartlett* and *Michael A. Rebell Associates,* attorneys), for respondents.

*Mark Gimpel* of counsel (*Caitlin J. Halligan, Melanie L. Oxhorn, Allison Penn, Deon J. Nossel, Sachin Pandya* and *David Lawrence, III* on the brief; *Eliot Spitzer, Attorney General,* attorney), for appellants.

*Robert E. Biggerstaff* of counsel (*Glen P. Doherty* and *Scott C. Paton* on the brief; *DeGraff, Foy, Holt-Harris & Kunz, LLP,* attorneys), for New York State Coalition For 853 Schools, Inc. and another, amici curiae.

*Denise C. Morgan, University of Michigan Law School,* for Black, Puerto Rican and Hispanic Legislative Caucus and others, amici curiae.

*Jay Worona* and *Pilar Sokol* for New York State School Boards Association, Inc. and another, amici curiae.

*Benjamin J. Ferrara* of counsel (*Norman H. Gross* on the brief; *Ferrara, Fiorenza, Larrison, Barrett & Reitz, P.C.,* attorneys), for Midstate School Finance Consortium, amicus curiae.

*Patricia T. Northrop* of counsel (*Christopher H. Withers* on the brief; *Davis Polk & Wardwell,* attorneys), for Association For the Help of Retarded Children and others, amici curiae.

*Jeremy M. Creelan* and *Will Wade-Gery* for Association of the Bar of the City of New York, amicus curiae.

*Sandra Del Valle* and *Michael N. Levy* of counsel (*Kathy L. Cooper* on the brief; *Puerto Rican Legal Defense & Education Fund* and *Swidler Berlin Shereff Friedman, LLP,* attorneys), for Puerto Rican Legal Defense & Education Fund and others, amici curiae.

*Steven Sanders* of counsel, for New York State Assembly Standing Committee on Education, amicus curiae.

*Norman Redlich* of counsel (*John F. Lynch* and *David B. Lat* on the brief; *Wachtell, Lipton, Rosen & Katz,* attorneys), for American Jewish Committee and others, amici curiae.

*Alan M. Klinger* of counsel (*Adam S. Grace* on the brief; *Stroock & Stroock & Lavan LLP* and *Carol L. Gerstl,* attorneys), for United Federation of Teachers, amicus curiae.

## OPINION OF THE COURT

LERNER, J.

The "sound basic education" standard enunciated by the Court of Appeals in *Campaign for Fiscal Equity v State of New York* (86 NY2d 307) requires the State to provide a minimally adequate educational opportunity, but not, as the IAS court held, to guarantee some higher, largely unspecified level of education, as laudable as that goal might be. Since the court, after a trial of the issues, applied an improper standard, we reverse.

Plaintiffs, students, parents and organizations concerned with education issues, commenced this action in May 1993 for a declaratory judgment and injunctive relief, on the ground that the State's public school financing system violated the Education Article of the State Constitution (NY Const, art XI, § 1), the Equal Protection Clauses of the Federal and State Constitutions (US Const 14th Amend; NY Const, art I, § 11), the Anti-Discrimination Clause of the State Constitution (NY Const, art I, § 11), title VI of the Civil Rights Act of 1964 (42 USC § 2000d *et seq.*), and the implementing regulations thereunder issued by the United States Department of Education (34 CFR 100.3 [b] [2]).

The State moved to dismiss the complaint for failure to state a cause of action, and ultimately the Court of Appeals ruled that plaintiffs had stated causes of action under the State Constitution's Education Article and the title VI implementing regulations (*Campaign for Fiscal Equity v State of New York*, 86 NY2d 307 [*CFE I*]). The Court ruled that the Education Article requires the State Legislature to offer all children "the opportunity of a sound basic education" (*id.* at 316). Although the Court declined to "definitively specify what the constitutional concept and mandate of a sound basic education entails," since this would be premature and would require the development of a factual record in order to be "fully evaluated and resolved," it did state that such an education "should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (*id.* at 316-317). According to the Court, the State must ensure that certain resources are made available under the present system in order to provide minimally acceptable essential facilities and services so that children may obtain a sound basic education (*id.* at 314-316).

Specifically, children are entitled to "minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn," as well as "access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks," and "minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas" (*id.* at 317). Nevertheless, the Court cautioned that "[p]roof of noncompliance with one or more of the Regents' or Commissioner's standards may not,

standing alone, establish a violation of the Education Article," since such standards often exceed notions of a minimally adequate or sound basic education and are sometimes merely aspirational (*id.*). Similarly, performance on standardized competency examinations established by the Regents and the Commissioner "[is] helpful," but should be used "cautiously as there are a myriad of factors which have a causal bearing on test results" (*id.*).

In order to prevail in the instant case, plaintiffs would have to prove a causal link between the present funding system and any proven failure to provide a minimally adequate educational opportunity (*id.* at 318-319). However, the Court of Appeals concluded that, at the pleading stage, plaintiffs had stated a cause of action, since the fact-based allegations of the "failure to provide the opportunity to obtain such fundamental skills as literacy and the ability to add, subtract and divide numbers would constitute a violation of the Education Article" (*id.* at 319).

Although the Court of Appeals dismissed the claim under title VI, since there was no showing of intentional discrimination, the Court of Appeals reinstated the claim for violations of title VI's implementing regulations, which merely require proof of discriminatory *effect*, not discriminatory *intent*, for a private cause of action (*id.* at 321-322). The Court of Appeals dismissed the cause of action under the Federal and State Equal Protection Clauses, on the ground that: (1) education is not a fundamental constitutional right and therefore a rational basis test applies; and (2) any disparities in funding arising from the State's financing scheme are reasonably related to the legitimate State interest in preserving and promoting local control of education (*id.* at 319-321).[1]

Upon remand, a nonjury trial was held during which 75 witnesses testified, generating 23,000 pages of transcript, and 4,300 documents were received in evidence.

New York City's public school system is the largest in the United States, with 1,189 schools, 1.1 million students, and

---

1. In *Reform Educ. Fin. Inequities Today (R.E.F.I.T.) v Cuomo* (86 NY2d 279), decided the same day as *CFE I* (86 NY2d 307), the plaintiffs asserted that the disparity in spending by property-rich districts as compared to property-poor ones had become so extreme, following *Board of Educ., Levittown Union Free School Dist. v Nyquist* (57 NY2d 27, *appeal dismissed* 459 US 1138), that the State's financing scheme was violative of the Federal and State Equal Protection Clauses and the State Education Article. The Court reiterated its holding in *Levittown* that there was no constitutional prohibition on disparate funding of districts (*R.E.F.I.T.*, 86 NY2d at 284-285).

over 135,000 employees (including 78,000 teachers, 19,000 teacher aides, and 38,000 others).[2] Overall supervision of the City schools is vested in the Board of Education (BOE), which is composed of seven members, one appointed by each of the five borough presidents and two by the mayor. In turn, BOE appoints a Chancellor, who is responsible for the school system's operation. The City school district is divided into 32 geographically based elementary and middle school community school districts (CSD's) (each of which has its own elected board, which does not exercise executive or administrative authority, and a superintendent appointed by the Chancellor), and six high school districts, overseen by a superintendent. In addition, there are four nongeographically based school districts for: (1) students with serious academic and other problems; (2) severely disabled children; (3) extremely low-performing districts; and (4) anomalous schools.

BOE and the other school districts throughout the State are subject to the jurisdiction of the State Education Department (SED), which is overseen by the Board of Regents (the Regents). This board is made up of 16 individuals who are elected by the State Legislature, and who in turn select the Commissioner of SED. Absent a specific State statute, the Regents dictate official State education policy. They also certify teachers and set educational standards, such as the subjects and units of study which are required to be taught and must be passed for graduation. The Regents and SED make budgetary recommendations to the Governor and the Legislature which, for the 2000-2001 school year, appropriated $13.6 billion for public education statewide, a $1.1 billion increase over the previous year. In fiscal year 2000, BOE received a total of $10.4 billion from federal, State, City and private sources, or about $9,500 per student. From 1994 to 2000, the State's share of the City's education budget increased from 47% to 51%, while the City's share decreased from 54% to 49%.

The State Constitution requires the Legislature to "provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (NY Const, art XI, § 1). As noted *supra*, the Court of Appeals has ruled that the Education Article charges the Legislature to offer all children the "opportunity of a sound basic education,"

---

2. The Court notes that amendments to the Education Law, effective July 1, 2002, will reorganize the Board of Education, Community School Boards and the New York City School Construction Authority (2001 NY Assembly Bill A 11627).

defined as "the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (*CFE I*, 86 NY2d at 316). The "failure to provide the opportunity to obtain such fundamental skills as literacy and the ability to add, subtract and divide numbers" constitutes a violation of the constitutionally mandated "minimally adequate educational opportunity" (*id.* at 319).

The Court of Appeals wrote that the exact meaning of a "sound basic education" could only be "evaluated and resolved" after discovery and the development of a factual record (*id.* at 317). In response, the IAS court interpreted the "skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (*CFE I*, 86 NY2d at 316) as requiring more than just enabling children to *qualify* for jury service and voting, since one need only be 18 years or older, a United States citizen residing in New York, and not incarcerated or on parole in order to vote, and one need only be 18 years or older, be able to understand English and not convicted of a felony in order to serve on a jury (187 Misc 2d 1, 13-14). Rather, the IAS court believed that an education must be provided which enables people to evaluate complex campaign issues, such as tax policy, global warming and charter reform, and to have the "verbal, reasoning, math, science, and socialization skills" necessary to determine questions of fact on such matters as DNA evidence, statistical analyses, and convoluted financial fraud (*id.* at 14). Contrary to the State's assertions, the IAS court did not rule that high school graduates must actually be experts in those various specialized fields, but only that they be able to understand such matters (by listening and reading), to communicate thoughts to fellow jurors, and to reach decisions. This is a reasonable formulation, since merely being able to find the jury assembly room or to pull a lever on a voting machine cannot be deemed "civic participa[tion]" (*CFE I*, 86 NY2d at 316) or the "skills, knowledge, understanding and attitudes necessary to participate in democratic self-government" (*id.* at 319).

The Court of Appeals had referred to the need for educating children to "function productively as civic participants" (*id.* at 316). The IAS court interpreted "function productively" as meaning to engage in "competitive employment," which the IAS court defined as something more than "low-level jobs paying the minimum wage" but not what would constitute preparation for acceptance into "elite four-year colleges" (187 Misc

2d at 14-18). The term "function productively" does imply employment. It cannot be said, however, that a person who is engaged in a "low-level service job" is not a valuable, productive member of society. In reaching the contrary conclusion, the IAS court was influenced by its opinion that such jobs "frequently do not pay a living wage" (id. at 16). Aside from the fact that that observation is unsupported by any statistics,[3] the IAS court, by substituting the concept of "competitive employment" for "productive functioning," expanded the already complex scope of the instant case to include such issues as minimum wage, housing costs and the capitalist system in general. Moreover, the IAS court acknowledged that the greatest expansion in the local labor market would largely consist of low-level service jobs, with which assessment plaintiffs' expert, Henry Levin, agreed. Thus, the IAS court went too far in stating that a sound basic education must prepare students for employment somewhere between low-level service jobs and the most lucrative careers. Rather, the ability to "function productively" should be interpreted as the ability to get a job, and support oneself, and thereby not be a charge on the public fisc. Society needs workers in all levels of jobs, the majority of which may very well be low level. The IAS court's aspirational standards, therefore, are inconsistent with the Court of Appeals' declaration that the Constitution only requires the "opportunity" for a "sound basic education" or a "minimally adequate * * * education" (86 NY2d at 316-317 [emphasis added]).

Thus, a "sound basic education" should consist of the skills necessary to obtain employment, and to competently discharge one's civic responsibilities. The State submitted evidence that jury charges are generally at a grade level of 8.3, and newspaper articles on campaign and ballot issues range from grade level 6.5 to 11.7 (based more on the publisher than on the issues reported). Plaintiffs' expert disagreed, but did not quantify the level needed. Thus, the evidence at trial established that the skills required to enable a person to obtain employment, vote, and serve on a jury, are imparted between grades 8 and 9, a level of skills which plaintiffs do not dispute is being provided. The IAS court rejected this evidence solely on the ground that the State Constitution should require something more than a ninth-grade education (187 Misc 2d at 14).

---

**3.** Plaintiffs' expert, Henry Levin, only testified that, on average, high school drop-outs earn 79% of the amount earned by high school graduates, and 50% of the amount earned by college graduates, and thus that "good" jobs require a college degree.

■ Nevertheless, the IAS court failed to posit an alternative level of skills; nor does the dissent enunciate a level other than something more than eighth-grade reading and sixth-grade arithmetic. The absence of a clearly articulated level helps explain why neither the IAS court nor the dissent is able to determine what programs or what amounts of funding are needed, and why they can only say that more money will lead to a better educational system. However, that is not the constitutional standard, and a statement that the current system is inadequate and that more money is better is nothing more than an invitation for limitless litigation. Moreover, as long as the State has "provide[d] children with the opportunity to obtain the[ ] essential skills, the State will have satisfied its constitutional obligation" to furnish a minimally adequate education (*CFE I*, 86 NY2d at 316), even though a higher level of education is extremely desirable. There was no evidence that students are unable to perform basic mathematical calculations, and allowing that some amount of history and civics, and science and technology, are components of a sound basic education, there was no evidence concerning what that amount should be or what amount is actually being provided. Accordingly, plaintiffs have failed to establish that the New York City public school children are not receiving the opportunity for a sound basic education. That is not to say that the State should not strive for higher goals; indeed, as the IAS court recognized, the new Regents Learning Standards, adopted in 1996, exceed any notions of a basic education (187 Misc 2d at 12).

It bears contemplation that the State's obligation is to provide children with the *opportunity* to obtain the fundamental skills comprising a sound basic education. That not all students actually achieve that level of education does not necessarily indicate a failure of the State to meet its constitutional obligations. The opportunity to obtain the fundamental skills is established by the provision of: (1) "minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn"; (2) "minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks"; and (3) "minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas" (*CFE I*, 86 NY2d at 317). The IAS court adopted that outline, and advanced seven categories of resources, which

essentially fall within the three areas set forth by the Court of Appeals: (1) sufficient numbers of qualified teachers, principals and other personnel; (2) appropriate class sizes; (3) adequate and accessible school buildings with sufficient space to ensure appropriate class size and implementation of a sound curriculum; (4) sufficient and up-to-date books, supplies, libraries, educational technology and laboratories; (5) suitable curricula, including an expanded platform of programs to help at-risk students by giving them "more time on task"; (6) adequate resources for students with extraordinary needs; and (7) a safe orderly environment (187 Misc 2d at 114-115).

Minimally Adequate Facilities

At trial, various superintendents gave anecdotal evidence concerning the condition of certain schools with leaky roofs, deficient heating, and other problems. Plaintiffs stressed that the State Legislature enacted the New York City School Construction Authority Act (Public Authorities Law § 1725 *et seq.*) in 1988 to create an agency exempt from local laws and regulations to repair, modernize and expand the City's schools, after a finding that "the elementary and secondary schools of the city of New York are in deplorable physical condition" in that "[m]any of the schools are overcrowded, unsafe, unhealthy and unusable." (L 1988, ch 738, § 1.) Such conditions, it was said, had been brought about largely due to "inefficient bureaucratic practices and lengthy review and approval processes" of BOE (*id.*). However, Lewis Spence, the Deputy Chancellor of Operations for the City schools, and Patricia Zedalis, the Chief Executive of the Division of School Facilities, testified at trial that all immediately hazardous conditions had been eliminated, and all buildings had been made watertight, at least by interim repairs The evidence at trial indicated that progress is being made in other areas. For example, 343 schools were heated by inefficient coal-burning boilers in 1995, whereas only 125 still had such boilers by 1999. Although there was evidence that some schools have no science laboratories, music rooms or gymnasia, there was no proof that these conditions are so pervasive as to constitute a system-wide failure, much less one that was caused by the school financing system, or one that can be cured only by a reformation of that system. This point was effectively conceded by the IAS court in its observation that plaintiffs failed to even try to measure the empirical effect of school facilities on student performance and that "the magnitude of [the perceived negative] effect is unclear from the evidence at trial" (187 Misc 2d at 49).

BOE records indicate that in 1997 there was an overload of 35,800 students in the City high schools and 28,000 in 11 elementary school districts, though it is unclear what the overall utilization rate would be if the remaining 21 districts were considered. While enrollment is projected to increase until 2004, it is also projected to drop by about 66,000 students by 2008. Overcrowding, which can be addressed through new construction, can also be dealt with by less expensive means, such as transferring students between schools, extending the school day or providing year-round education. Plaintiffs' complaint that busing will move students outside their neighborhoods is at odds with their allegation of racial segregation, and the long history of busing to address this condition. Contrary to plaintiffs' further assertion, the State does not prohibit year-round education.

The evidence established that class sizes average between 23.8 to 28.72 students per class for kindergarten through grade eight. While plaintiffs' experts and witnesses testified that students perform better in a class of 20 or fewer pupils, there was no indication that students cannot learn in classes consisting of more than 20 students, and plaintiffs concede that the City's Catholic schools have larger classes yet outperform public schools. Thus, the IAS court's implication that classes of over 20 students are unconstitutional is unsupported.

In sum, while no witness described the condition of the City schools' facilities as perfect, neither was there sufficient proof that the facilities are so inadequate as to deprive students of the opportunity to acquire the skills that constitute a sound basic education.

Minimally Adequate Instrumentalities of Learning

Plaintiffs concede that recent funding increases have relieved a textbook shortage, but nevertheless complain that there is no assurance that the recent spike in textbook funding will continue. They also wonder whether "the recent influx of dedicated technology funding will continue," and argue that 9.2 computers per 100 students (in 1997) is inherently inadequate, while 18.2 computers per 100 students (the ratio in the rest of the State) is sufficient. Thus, plaintiffs concede that recent funding has relieved the previous alleged inadequacies. Moreover, a mere comparison with the rest of the State reveals little about the constitutional mandate and, granting that some of the City's computers cannot run the most advanced systems or connect to the Internet, plaintiffs never explained why they cannot be used for introductory classes. Thus, plaintiffs failed

to establish that those instrumentalities of learning are inadequate, and as the IAS court observed, there was little except anecdotal evidence concerning the amount of supplies such as chalk, paper, desks, chairs, and laboratory supplies.

Contrary to the IAS court's findings, the twin facts that the average number of books per student in the City's schools lags behind that of the rest of the State, and that the State allocates only $4 per student for library materials, do not demonstrate that the City's libraries are inadequate. Furthermore, the IAS court's finding that the books are inadequate in quality appears to be predicated solely on certain superintendents' opinions that most of the books were "antiquated," in that they were "not current in terms of * * * the multicultural themes our children should be exposed to." However, we believe that such a yardstick is not determinative. Surely, a library that consists predominantly of classics should not be viewed as one that deprives students of the opportunity of a sound *basic* education.

Minimally Adequate Teaching

The IAS court ruled that, in general, the teachers in the City's public schools are not qualified, as determined by a comparison with the rest of the State's teachers on teacher certification status, scores on certification tests, experience, turnover rate, quality of the institutions the teachers themselves attended, and the percentage of teachers with a Master's degree or higher.

Board of Education records indicate that from 1991 to 1999, the percentage of uncertified teachers in the City has ranged from 11.4% to 13%; in 1999, 12.8% of the 78,162 teachers were uncertified. Richard Mills, the Commissioner of Education, testified that there is a "clear pattern" that the lowest performing schools tend to have the highest proportion of uncertified teachers. Although the IAS court believed that certification standing alone is no guarantee of teacher quality, Thomas Sobol, Education Commissioner from 1987 to 1996, asserted that certification assures a minimal level of competence and ability to teach. He further maintained that although the quality of an uncertified teacher is uncertain, the lack of certification does not necessarily mean a teacher is incompetent. In any event, the Regents have required that all schools have only certified teachers by 2003.

As of the 1997-1998 academic year, 31.1% of City public school teachers had failed the basic certification test (the Liberal Arts and Sciences Test or LAST) at least once, and the

mean score for first time takers was 236.3 (on a test where 220 is passing). Outside the City, 4.7% of public school teachers had failed it once and had a mean first time score of 261.6. There was a similar divergence on other tests: 21.1% of City teachers failed English Content at least once while 2.2% outside the City failed; 47.3% of City teachers failed the Math Test while 21.1% outside the City failed; 19.6% of City teachers failed the Social Studies Test while 5.9% outside the City failed; 37.0% of City teachers failed the Biology Test while 11.9% outside the City failed; and 24.1% of City teachers failed the Chemistry Test while 15.4% outside the City failed. Dr. Ronald Ferguson, plaintiffs' expert, stated that, based on his study conducted from 1986 to 1990 in Texas, students scored higher on state examinations in districts where teachers scored higher on state certification examinations, although he conceded that some other factors could possibly account for the student results.

In the 1997-1998 academic year, 14% of City public school teachers had two years or less experience, compared with 9.7% in the rest of the State. Although various plaintiff witnesses testified that teachers with more than two years of experience are generally better, the median experience for City teachers is 13 years.

With respect to the academic credentials of City teachers: 16% have only a Bachelor's degree, 40.4% have a Master's and 43.5% have a Master's degree plus 30 credits or a doctorate. For teachers in the rest of the State, the numbers are 10.9%, 64.1% and 25%, respectively. It was undisputed that the City's teaching force, in general, comes from less competitive undergraduate institutions than does that of the rest of the State.

The mere fact, however, that the City's teachers have lower qualifications than those in the rest of the State does not establish that the City's teachers are inadequate, as the IAS court reasoned. The IAS court gave insufficient weight to the evidence that from 1995 through 1998, only 523 teachers, or less than 1% of the 78,000 employed, received "unsatisfactory" ratings on annual performance reviews filled out by principals. Although various superintendents asserted that "unsatisfactory" ratings are generally reserved for the "worst of the worst," and are rarely given to underperforming teachers because of the additional paperwork involved and the prospect of unknown replacements, nevertheless, there was no testimony from principals, the ones who actually fill out the forms. We

find that reviews of teaching ability, completed by principals in daily contact with teachers, are more indicative of a teacher's ability to instruct than is a teacher's curriculum vitae, or a superintendent's supposition that deficiencies are unreported due to sloth or fear. Although certain superintendents and Education Department employees testified that professional development to help train teachers is lacking, they did not specifically state why the $3,000 per teacher spent on professional development is insufficient.

In support of its finding that the State has failed to provide a sound basic education or minimally adequate facilities, teachers, and supplies, the IAS court cited various "outputs" or results.

For example, from 1986 to 1996, about 30% of City students failed to obtain any diploma, 10% received GED diplomas, 48% obtained "Local Diplomas," and 12% achieved "Regents Diplomas." In order to obtain a "Local Diploma," a student must pass all required courses and a series of Regents Competency Tests (RCT's) which test students at an eighth-to-ninth-grade reading level and a sixth-to-eighth-grade math level; students are also tested in United States history and government, science, and global studies. In order to obtain a "Regents Diploma," a student must pass a series of Regents Exams based on "Regents Learning Standards" (RLS's), which test at a tenth-to-eleventh-grade reading level. Prior to 1996, students had a choice of whether to take the RCT's or the Regents Exams, but the Board of Regents is phasing out the RCT's and plans to eliminate them completely by 2005. While plaintiffs' expert, Dr. Richard Jaeger, testified that the RCT's do not test at a level sufficient to demonstrate the skills needed to understand jury charges or ballot propositions, the State's expert, Dr. Herbert Walberg, disagreed. Plaintiffs concede that students who have passed the RCT's may have been capable of passing the Regents Exams, which, plaintiffs agree, demonstrates that a student has obtained a sound basic education.

The IAS court attacked the RCT's on the ground that a City University of New York task force determined that most graduates of City high schools need remediation in one or more basic skills. However, a "sound basic education" consists only of those skills necessary to enable children to "eventually function productively as civic participants capable of voting and serving on a jury," not to qualify them for advanced college courses or even attendance at a higher educational institution (*CFE I*, 86 NY2d at 316). Furthermore, by effectively adopting

the RLS standards as the measure of a sound basic education, the IAS court disregarded the Court of Appeals' exhortation to use performance levels on standardized examinations "cautiously" (*id.* at 317). In any event, the RCT's will be completely phased out by 2005, and thus any deficiency in their usage will be eliminated.

Although plaintiffs would most likely disagree with the characterization, their position is essentially a form of res ipsa loquitur: the fact that 30% of City students drop out and an additional 10% obtain only a GED must mean that the City schools fail to offer the opportunity of a sound basic education, which is ultimately the State's responsibility (pursuant to the Education Article), and therefore the State's funding mechanism must be the cause of the problem. However, the proper standard is that the State must offer all children the *opportunity* of a sound basic education, not *ensure* that they actually receive it. Thus, the mere fact that some students do not achieve a sound basic education does not necessarily mean that the State has defaulted on its obligation. Notably, the standard is a "sound basic education," not graduation from high school; nor can the State be faulted if students do not avail themselves of the opportunities presented.

Although there was evidence that the failure to obtain a high school diploma (and to some extent possession of only a GED) limits one's ability to obtain high-paying jobs, there was no evidence that such a person is ipso facto an unproductive citizen incapable of intelligently voting or serving on a jury. In short, there was no evidence quantifying how many drop-outs fail to obtain a sound basic education, let alone were denied the opportunity to get one. In fact, for 1997-1998, 90% of the City's eleventh graders achieved graduation competency status in English and mathematics by passing either the RCT's or the Regents examinations in those fields. It is unclear how many students dropped out of school (never to return) before that point or why a large number of them did not obtain a degree (i.e., whether for failing an examination in another discipline such as global studies or failing to obtain sufficient credits in some other course of study).

The IAS court also failed to give proper weight to nationally normed reading and math tests, which are used by more than one third of school districts across the United States. Indeed, from 1996 to 1999, for grades three through eight, it was demonstrated that City public school children scored at or close to the national average. The IAS court dismissed that statistic as

insignificant, since it merely compares City students to students elsewhere in the nation, notwithstanding the court's reliance on comparisons between City students and pupils from the rest of the State to demonstrate inadequacy. However, we do not confine our analysis only to comparisons between students from the City and the rest of the State. Instead, we look at the nation as a whole, to the extent that such comparisons are indicative of the provision of the opportunity for a sound basic education.

To the extent that the State relies on Performance Assessments in Schools Systemwide (PASS) reviews to demonstrate that schools are "close to being exemplary," they were properly rejected by the IAS court, since they are generally used as self-assessment reports by schools having a natural interest in rating themselves highly.

Even if we were to assume that the schools in the City do not provide a sound basic education, plaintiffs failed to prove that deficiencies in the City's school system are caused by the State's funding system. The IAS court conceded as much by relying on a standard that "[i]f it can be shown that increased funding can provide New York City with better teachers, better school buildings, and better instrumentalities of learning, then it would appear that a causal link has been established between the current funding system and the poor performance of the City's public schools" (187 Misc 2d at 68). However, the constitutional question is not whether more money can improve the schools, but whether the current funding mechanism deprives students of the opportunity to obtain a sound basic education.

Both parties agree that the City students' lower test results in comparison with the rest of the State are largely the result of demographic factors, such as poverty, high crime neighborhoods, single parent or dysfunctional homes, homes where English is not spoken, or homes where parents offer little help with homework and motivation. Although there was evidence that certain "time on task" programs, such as specialized reading courses, tutoring and summer school, could help such "at-risk" students, nevertheless, plaintiffs' own expert, Dr. David Grissmer, conceded that investing money "in the family" rather than the schools "might pay off even more." That is not to say that this circumstance lessens the State's burden to educate such students. But it is indicative of the fact that more spending on education is not necessarily the answer, and suggests that the cure lies in eliminating the socio-economic conditions facing certain students.

There was also significant evidence that sizeable savings could be reaped through more efficient allocation of resources by BOE, which would then make available large sums of money for programs which are purportedly underfunded, such as "time on task" programs. For example, the IAS court recognized that merely placing disabled students in the least restrictive environment possible (a position amici Association for the Help of Retarded Children and similar entities support, and which conforms with federal requirements [20 USC § 1412; 34 CFR 300.550]), would yield a savings of somewhere between $105 million and $335 million. The court also acknowledged that "tens of thousands" of the 135,000 students in special education have been improperly placed there, and indeed that over 80% of students classified as learning disabled do not meet that standard. (187 Misc 2d at 95.) Since BOE expends $2.5 billion annually, or over 25% of its budget, on special education, the savings created by returning improperly referred students to the general school population (where the cost is 50% to 75% less per student than special education) would amount to hundreds of millions of dollars, if not $1 billion, even after accounting for the cost of redirecting students to the general population.

The IAS court failed to consider this fact or otherwise dismissed it as "equivocal" in any amount above "tens of millions of dollars." (*Id.* at 97.) Similarly, the dissent opines that any savings are merely "wishful thinking." In the absence of any proof to support such suppositions, however, the IAS court and the dissent are effectively applying a presumption of unconstitutionality to the Legislature's funding laws, the reverse of the standard that must be applied (*see, Hymowitz v Eli Lilly & Co.*, 73 NY2d 487, 515, *cert denied* 493 US 944). Indeed, it is plaintiffs' burden to demonstrate that the current funding scheme is unconstitutional and that the only way to allocate sufficient resources to the programs they desire is to annul the entire funding mechanism. Plaintiffs have failed to demonstrate that the proper placement of students will not generate the savings mentioned herein, and as amply supported at trial, or that such amounts will not be able to finance the "time on task" programs they deem necessary.

To support their case, plaintiffs rely to a great extent on the fact that less money is expended per student in the City than the rest of the State. Not only is this an impermissible equality, rather than adequacy, claim, foreclosed by *Levittown* (*supra*), but plaintiffs then inconsistently argue that it is meaning-

less to consider that the City is among the highest spenders compared to the rest of the country or other large urban school districts. Plaintiffs' claim that it costs more to educate students in New York City than elsewhere in the State is based, to a large extent, on a cost of living index which factors in salaries of noneducators, and is thus irrelevant to the cost of educating a student.

Notably, the dissent agrees that students who are not "at risk" are receiving a sound basic education, but argues that "at-risk" students are being deprived of the opportunity. The dissent then goes on to categorize almost the entire City student population as "at risk." This implicates the system of education, not the system of funding. If all "at-risk" students need "time on task" programs, and almost all students are "at risk," then the pedagogic system should be geared towards such students. That is to say, more classes should utilize "time on task" or other effective methods. As noted *supra*, significant numbers of students have been improperly placed in restrictive settings or special education classes where they do not belong, and where they are not receiving the education they need. Once again, this is a problem of the educational system, not the funding system. In fact, proper placement will yield large amounts of money which can be reinvested into "time on task" programs.

The dissent's primary complaint with the adequacy of the teaching staff, that the neediest students are assigned the least qualified teachers, is an argument which does not involve the funding system. As the dissent admits, the assignment of experienced, i.e., senior, teachers is the product of collective bargaining agreements, not the manner in which the State funds the City's schools.

Although the State cites instances of fraud and/or waste in construction, such work is now mostly controlled by the State School Construction Authority, rather than BOE, and thus the State bears responsibility, though it does not necessarily implicate the State's funding mechanism. We also reject the State's contentions that: (1) any inadequacy in funding is the fault of the City, which has reduced its percentage of overall educational funding over the last few years, and that (2) it would be unfair to essentially allow the City to dictate how much the State spends. Joint funding of education by the State and the localities has been acknowledged to be reasonably related to the legitimate State interest in preserving and promoting local control over education (*Levittown*, 57 NY2d at 44).

However, the State must "assure" that some essentials are provided, and thus it is indeed ultimately responsible for providing students with the opportunity for a sound basic education (*see*, *CFE I*, 86 NY2d at 316-317). Moreover, the State exerts extensive control over the City, including taxes that may be levied and debts that may be incurred. Nevertheless, requiring the State to write out a check every time the City underfunds education is not the only possible means of redress; rather, the State could require the City to maintain a certain level of education funding. In fact, Education Law § 2576 (5), the "Stavisky-Goodman Law," requires the City to spend at least the average of the prior three years' expenditure on education. While plaintiffs and the IAS court complain that the law has not been enforced, the remedy is to seek compliance with that statute, rather than to annul the entire State funding system.

■ The IAS court also found that the State's funding system has a disparate impact on minority students, in contravention of the title VI implementing regulations, promulgated by the United States Department of Education (DOE). Section 601 of title VI, codified at 42 USC § 2000d, provides: "No person * * * shall, on the ground of race, color, or national origin, be excluded from preparation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Section 602 of title VI, codified at 42 USC § 2000d-1, authorizes federal agencies to "effectuate the provisions of section 2000d of this title * * * by issuing rules, regulations, or orders of general applicability." Pursuant to that authority, DOE has promulgated a regulation prohibiting a recipient of federal financial assistance from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin" (34 CFR 100.3 [b] [2]).

As noted *supra*, title VI itself only prohibits intentional discrimination (of which there is no allegation in the instant case), and plaintiffs concede that, under the recent United States Supreme Court decision in *Alexander v Sandoval* (532 US 275) there is no private right of action under the implementing regulations, since the empowering statute reveals no Congressional intent to create one. Nevertheless, plaintiffs argue that they may still enforce the regulations through 42 USC § 1983, which provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by anyone acting "under color of any statute,

ordinance, regulation, custom, or usage, of any State." As the dissent by Justice Stevens in *Sandoval* made clear, the plaintiffs in that case did not allege a section 1983 claim (*Sandoval*, 532 US at 300).

The cases determining whether a federal "law" gives rise to a section 1983 claim have generally interpreted that term as applying to "statutes" (*see, e.g., Maine v Thiboutot*, 448 US 1; *Blessing v Freestone*, 520 US 329), and the contrast between the language "Constitution and laws" and "statute, ordinance, regulation, custom, or usage" in section 1983 demonstrates that Congress distinguished between statutes and regulations, and that regulations, standing alone, are not "laws" within the meaning of section 1983 (*see, Mungiovi v Chicago Hous. Auth.*, 98 F3d 982, 984 [7th Cir]).

In *Chrysler Corp. v Brown* (441 US 281, 301-303), decided in the context of the Trade Secrets Act (18 USC § 1905), which prohibits the disclosure of information "not authorized by law," and not 42 USC § 1983, the Court did state that a regulation may have the "force and effect of law" if: (1) it is substantive (a legislative-type rule that affects individual rights and obligations, rather than interpretive, a general statement of policy or a procedural agency rule); (2) it is promulgated by an agency pursuant to a Congressional grant of quasi-legislative authority; and (3) the promulgation of the regulation conforms with any procedural requirements imposed by Congress. Although the Supreme Court in *Wright v City of Roanoke Redevelopment & Hous. Auth.* (479 US 418) approvingly cited *Chrysler Corp.* (at 431-432), it found a viable section 1983 claim based on a *combination* of a statute (the Brooke Amendment to the Housing Act of 1937 [42 USC § 1437a], which imposed a ceiling for "rents" in public housing projects) *and* the implementing regulations thereunder of the Department of Housing and Urban Development (which defined "rent" as including a reasonable amount for utilities), which the Court later made clear in *Suter v Artist M.* (503 US 347, 361 n 13). Thus, *Wright* (*supra*), did not hold that a regulation, standing alone, is a "law" enforceable via section 1983. In other words, "so long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute—'in conjunction with the regulation'—may create a federal right as further defined by the regulation" (*Harris v James*, 127 F3d 993, 1009 [11th Cir] [citing *Suter*, 503 US at 361 n 13]; *see also, Mungiovi*, 98 F3d at 984 [7th Cir]; *Smith v Kirk*, 821 F2d 980, 984 [4th Cir]

["(a)n administrative regulation * * * cannot create an enforceable § 1983 interest not already implicit in the enforcing statute"]). As the Eleventh Circuit noted in *Harris*, the touchstone of the Supreme Court's decision in *Wright (supra)*, was the Congressional intent to create a particular federal right (*Harris*, 127 F3d at 1007-1008).

The DOE implementing regulations at issue in the instant case fail under that analysis, since the regulations do not flesh out the content of a statutory right, but rather contradict the statute. Although the Court in *Sandoval* assumed, without deciding, that the regulations "may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601" and noted that five Justices (in three separate opinions) voiced that view in *Guardians Assn. v Civil Serv. Commn. of City of N.Y.* (463 US 582), as did dictum in *Alexander v Choate* (469 US 287, 294 n 11), such statements were "in considerable tension" with the Court's holding in other cases that section 601 forbids only intentional discrimination (*Sandoval*, 532 US at 281-282). To the extent that the dissent in *Sandoval* posited that merely referencing section 1983 enables litigants to enforce title VI enabling regulations (*id.* at 300 [Stevens, J., dissenting]), the majority cautioned that the silence of a majority on an issue raised in a concurring or dissenting opinion does not imply agreement (*id.* at 285 n 5).

The circuits which have determined that regulations alone can support a section 1983 claim either assume so without any analysis or rely on an interpretation of *Wright*, which for the reasons discussed *supra*, should be rejected (*Loschiavo v City of Dearborn*, 33 F3d 548, 551 [6th Cir], *cert denied* 513 US 1150), or they have stated it in dictum (*DeVargas v Mason & Hanger-Silas Mason Co., Inc.*, 844 F2d 714, 724 n 19 [10th Cir]). Other circuits, while expressing the same broad principle, have actually decided cases based on a regulation in conjunction with the authorizing statute (*Buckley v City of Redding, Cal.*, 66 F3d 188 [9th Cir]; *Samuels v District of Columbia*, 770 F2d 184 [DC Cir]). The Second Circuit has declined to address whether a regulation, standing alone, is sufficient to create a federal right upon which a section 1983 claim can be based (*King v Town of Hempstead*, 161 F3d 112, 115 [2d Cir]; *Rodriguez v City of New York*, 197 F3d 611, 617 [2d Cir], *cert denied* 531 US 864), and the District Courts within the Second Circuit are split on the issue (*see, Dajour B. v City of New York*, 2001 WL 830674, *8 n 7, 2001 US Dist LEXIS 10251, * 26 n 7 [SD NY, July 23, 2001] [and cases cited therein]).

The only court to decide the specific issue as applied to title VI implementing regulations after *Sandoval* has determined that there is no cause of action under section 1983 for a violation of the title VI implementing regulations, since they do not merely define a right Congress already conferred by statute, but rather "give the statute a scope beyond that Congress contemplated" (*South Camden Citizens in Action v New Jersey Dept. of Envtl. Protection*, 274 F3d 771, 790 [3d Cir]).

We agree that DOE's implementing regulations do not merely "flesh out" a federal right created by Congress in title VI, but rather, create a new right, not indicated in the statute. Section 602 of title VI, codified at 42 USC § 2000d-1, only authorizes federal agencies to "effectuate the provisions of section 2000d of this title * * * by issuing rules, regulations, or orders of general applicability," not to create new rights, and accordingly, the implementing regulations, standing alone, do not create a federal "right" upon which a claim can be brought under section 1983 (*see, Sandoval*, 532 US at 286-291).

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Leland DeGrasse, J.), entered January 31, 2001, which, following a nonjury trial, declared that the State's method of funding education violates the Education Article of the State Constitution and the United States Department of Education's implementing regulations under title VI of the Civil Rights Act of 1964, and directed the State to implement various "reforms of school financing and governance" (187 Misc 2d at 116), should be reversed, on the law and the facts, without costs, a declaration made in favor of the State of New York that the State's educational funding system does not contravene the constitutional Education Article, and the claim under the DOE implementing regulations and 42 USC § 1983 dismissed.

TOM, J.P. (concurring). I agree with the majority's conclusion that the State's method of funding education does not violate the Education Article of the New York State Constitution and the United States Department of Education's implementing regulations under title VI of the Civil Rights Act of 1964. Moreover, many of the points raised by plaintiffs and the amici parties, and articulated by the decision of the IAS court, are issues that relate to how the New York City school system is administered. The administration of the system appears to be a substantial contributing factor in the failings of our public school system. On this basis, I also disagree with Justice Saxe's

dissent, though he makes a persuasive argument on behalf of "at-risk" students. However, a constitutional challenge to the funding of the school system must view the system as an entirety rather than parse its parts, and especially not be fixed only on particular programs. For constitutional purposes, once we as judges start micromanaging how a school system as vast and complicated as this one is to be administered, and how funding is to be distributed to ensure that portions of the student body are better served, we are really traversing a very problematic region that is quintessentially administrative and perhaps even political in nature. We should do so only with the greatest circumspection. Our task is not to evaluate how this municipal school system is administered, but to determine whether the level of State funding is depriving students of an opportunity for a sound basic education. Plaintiffs have failed to carry their burden of proving that link.

However, one cannot dispute that a nascent educational crisis has been growing over the years, with roots decades deep, but with consequences that are taking on a new urgency. As the record reflects, approximately 30% of high school students drop out and fail to obtain a degree. Approximately 10% of high school students obtain only a general equivalency diploma (GED), for which the requirements are so low that GED recipients who attend college have only a 2% completion rate. Of the remaining 60% of students who do graduate, only about 12% opt to take the examinations qualifying for a "Regents diploma," while the remaining 48% opt for a "local diploma," which merely requires that students pass tests for reading comprehension at the ninth- grade level and math at the sixth-grade level. The record further reflects that 80% of City public school graduates who enter the City University of New York require remedial help in basic areas such as reading and math, and 50% require remedial help in more than one area. As noted, however, plaintiffs have failed to prove a causal link between the State's funding mechanism and the deficiencies of City schools.

The growing crisis, such as it is, results from a matrix of administrative, demographic, and economic factors which, one may fairly judge from the appellate record, are not presently resolvable by increased State spending. That is a short-term expedient rather than a realistic long-term solution to numerous problems which are not necessarily related to each other, and some of which may even be intractable from the standpoint of State funding. One may reasonably take from plaintiffs' as

well as the State's positions the apt point that the very complexity of the system requires either that its many problems be directly and innovatively addressed, or, alternatively, that a complete overhaul be undertaken. I offer no opinion on this, but only observe that State funding, itself, is not a magic bullet. Mere budgetary fixes, extracted from the State rather than from the City or even by shifting resources within the system itself, are not going to achieve a system-wide functionality that has evaded prior budgetary infusions and half-hearted administrative reforms over the years. If the system contains serious flaws within the managerial level, one must worry whether an infusion of funding will only be absorbed into the system with minimal or no improvement in raising the educational achievements of students. Moreover, one must seriously wonder how a system that seems historically mismanaged and chronically unaccountable financially— accepting for the moment some of the characterizations in the record—is going to become miraculously better managed and more financially accountable just because more attractive funding can be extracted from Albany. Such a quick-fix approach seems better described as a two-dimensional numbers game being played out in a multi-dimensional system.

These are administrative and logistical problems and, to some extent, demographic challenges. One may even posit that at some fundamental level they are political issues, either in terms of necessary legislation, or in terms of greater State oversight, or deciding what should be the appropriate relationship between the system's administration and the Mayor, or the role, if any, to be played by local school boards, or even the obvious questions of how and why personnel have been hired over the years and who should be hired in the future and why a purportedly flawed administrative structure still remains. Some of these matters, especially the role of the Mayor, are, in fact, being addressed now. Many of these issues are not presently justiciable, and others are not before us. We are reviewing only the constitutional issue and, as I stated, I concur with the majority's conclusion that plaintiffs have not demonstrated, on this record, a present constitutional violation.

However, this is not to say that if current trends continue, there are no future constitutional consequences. In this regard, I focus on the personnel of the school system who, in the final analysis, must be seen as the most important elements from a purely pedagogical standpoint—the teachers. Administrators may come and go. But it strikes me as being beyond serious

dispute that the quality of the teachers will necessarily and directly affect the educational process and whether educational standards can be satisfied. Justice DeGrasse very appropriately made this point. It should also be beyond dispute that the teaching quality necessary to provide an opportunity for an adequate education itself depends on the simultaneous presence of several discrete qualities: educational credentials, teaching experience, communicative skills, a nurturing temperament, and a pedagogical mission. The logic seems inescapable that the input of these factors necessarily affects the educational output: the students' level of knowledge and the intellectual rigor they will be able to bring to the decisions of everyday life. Again, the trial court's analysis seems to me to reflect very good common sense, and I especially share its concern for the number of uncertified teachers in the system though, as he notes, more rigorous certification requirements have been scheduled by the Regents, effective after 2002.

However, there remains the problem of ensuring that sufficient numbers of teachers actually certified will remain for the foreseeable future and that new teachers are willing to work in the New York City school system. If the system cannot attract or retain qualified educators, then students will not receive a sound basic education, as that standard has been constitutionally applied. Notwithstanding the many complexities being forced into the constitutional question before us, I would suggest that this correlation seems very simple: the system must attract and retain qualified teachers if it is to produce qualified students. I would further venture that teacher compensation, coupled with work environment, the predictability of advancement, job satisfaction, job location and all the other variables that are factored into employment decisions, play a role in where qualified educators choose to start and spend their careers. Hence, at some level, how the school system is funded, and where the funding is distributed, and how teacher compensation is coupled with rigorous State standards, relates to the quality of the students' education. To the extent that the adequacy of the education made available by the New York City school system, in its many parts, is impaired by the system's inability to attract and retain qualified teachers, a constitutional issue, then, may be presented.

I accept for present purposes the State's data as to teachers' compensation, class size, spending-per-student ratios, and the like, and also accept that we may use national comparable as well as State comparable as units of measurement. However,

on the question whether the system can attract and retain sufficient qualified teachers as to offer a sound basic education, the record demonstrates some disturbing trends. The trial court points out that uncertified teachers will be removed from the system by 2003, and that the Board of Education has not been allowed to hire uncertified teachers since 1999. Considered in isolation, this would seem to be a beneficial goal in terms of anticipated pedagogical results. Yet, what if these gaps cannot be filled by qualified teachers—with qualifications evaluated by certification plus such other factors that enhance the effectiveness of the teaching? The trial court's decision sets forth statistics indicating that New York City teachers have had difficulties in getting certified. The system seems to have trouble attracting competitive numbers of potential teachers who can even meet the requirement of certification. The issue then becomes not whether the system can get the best of the best, an ideal goal that is not likely achievable in the immediate future, but whether there will be adequate qualified replacements as experienced teachers retire or, in many schools, transfer.

A healthy educational system, it seems, should be able to rely on competition among more than enough qualified candidates for teaching positions, so that a system that faces chronic shortages of such candidates would be, almost by definition, unhealthy. Undoubtedly, at some point, the functioning of an unhealthy system spirals downward as desirable personnel, facing increasing responsibilities but decreasing satisfaction, continue to leave in response to their work environment. It does not take extraordinary imagination to conclude that such a system at some point cannot provide even a basic education. The issue then becomes not just certification of some teachers, per se, which, as noted, is being addressed administratively, but whether sufficient numbers of qualified teachers can even be attracted and retained to prop up the system as new classes of students enter and leave. This is not a problem that can be easily deferred as a solution is devised. Before long, the problem is not so much that some programs are being inadequately funded, or some schools are favored over others within the larger system, which, I think, is central to Justice Saxe's concern, but that the system as a whole totters. That, I think, would certainly get closer to the heart of the constitutional issue.

From here, the analysis then turns to why the school system may face such a deficiency in its core pedagogical mission.

Again, Justice DeGrasse's decision, and the appellate record, fairly state the case that ideal teaching candidates have already been going elsewhere to pursue their careers, a trend that does not seem to be abating, and other qualified candidates seem to be joining that trend. Certainly, and as noted above, work environment and career opportunities are weighed in such individual and perhaps even idiosyncratic decisions, but the sharp disparity in annual compensation (and, inevitably, in the consequences for pensions) may well be dispositive in a critical mass of cases. Those teachers leaving the system for other educational employment and those considering entering the teaching profession, but elsewhere, are not necessarily relocating to other regions. They are looking to the New York City suburbs for employment, where, as the State's and BOE's own evidence indicates, they may receive 20% to 36% more in compensation while working in a generally more favorable school environment. Here, competition severely disfavors the New York City system.

I will not pretend to know what is the magic number that will reverse this trend, and I have no intention of suggesting results that are more appropriate to collective bargaining. The argument may even be made that compensation should be linked with increased productivity. Nor am I suggesting that the teacher's union is entitled to a windfall as a consequence of the present litigation. My concern is with the students, and not the teachers. Rather, it is the trend itself, and its impact on the basic soundness of the education being offered to New York City students, in the aggregate, that concerns me.

As Justice DeGrasse points out, a fact supported by the record, normal attrition between 2000 to 2004 will require the replacement of some 41,105 teachers. Anecdotally, though perhaps plausibly in view of retirement factors, one is given to understand that the number of experienced teachers leaving the system may well exceed this estimate over the next few years. These retirements, to the extent that they occur as is estimated, will be straining the teaching resources of the system during a period of time that the system is also shedding uncertified teachers. Yet, teachers who would be suitable replacement candidates seem to be looking not very far afield at suburban school districts and their better pay and working conditions. Though we are deciding a constitutional challenge rather than merely stating educational preferences, I am still concerned with that apparent trend, and what it portends for the pedagogical integrity of the system. It may be an ironic

result that, as the State and BOE, commendably, move to enforce higher standards on teacher hiring and retention, the numbers of qualified teachers in the system may shrink proportionately, unless some missing variable provides a solution. Otherwise, an administrative crisis may well take on stronger constitutional overtones. That is where school funding and especially the State contribution will likely become a critical component of a renewed constitutional challenge. Hence, while I join the majority in its conclusions and part of its analysis, I would not yet close the door on plaintiffs' claims that funding decisions at some level, specifically in the impact on hiring and retention of qualified teachers, may trigger a State constitutional violation.

SAXE, J. (dissenting in part). The Education Article of the New York State Constitution (NY Const, art XI, § 1), mandates that every public school student be provided with the opportunity to obtain a sound basic education (*see, Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 315, citing *Board of Educ., Levittown Union Free School Dist. v Nyquist*, 57 NY2d 27, 48, *appeal dismissed* 459 US 1138). The trial court, after hearing over 100 days of testimony from over 70 witnesses, essentially found that the New York City school system is not receiving sufficient funding to offer all of its students the required opportunity for a sound basic education. While I, like my colleagues, take issue with certain of the trial court's conclusions and directives, there was more than ample support for the central finding that the City's "at-risk" students, amounting to a large segment of its student population, are unable to obtain the education to which they are entitled. Further, evidence supports the trial court's conclusion that it is deficiencies in the programs, personnel, tools and instrumentalities of learning provided by the City schools that prevent these at-risk students from obtaining an education, and that these deficiencies are due to a lack of funds needed to provide the needed programs, personnel and training.

Of course, this Court has authority as broad as that of the trial court to review the evidence and make different findings of fact (*see, Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499). However, the evidence here so strongly supported the trial court's fundamental conclusions with regard to the education being provided to "at-risk" students that the trial court can only be reversed by ignoring either much of the evidence or the actual circumstances of the City's student population.

The Relevance of the Needs of the City's "At-Risk" Students

New York City's 1.1 million public school students include a large percentage of children at serious risk of academic failure due to poverty and other socioeconomic and demographic factors. It was established that in past years, 73% of New York City students have been eligible for the federal free lunch program offered to low-income students, over 40% have come from families receiving Aid to Families with Dependent Children, and that 84% of its students are from a racial minority group. Over 90% of the State's recent immigrants live in New York City, and over 80% of the State's students with limited proficiency in English live here as well.

Generally, the "at-risk" label has been applied where several factors affect a child's education: as the trial court recognized, poverty, race, ethnicity, and immigration status are not in themselves determinative of student achievement, but the life experiences that are correlated with those factors tend to create barriers to academic achievement. In addition, children from impoverished families may experience further hurdles if they attend a school filled with similarly disadvantaged children, schools with "concentrated poverty." Further, children from poor immigrant families may also experience problems with limited English language proficiency.

The State protests that these statistics have no applicability to this case, contending that deficiencies in student performance that are attributable to socioeconomic conditions extrinsic to the education system are not relevant to assessing whether schools are meeting constitutional standards. It takes the position that once socioeconomic factors are factored out, spending has no significant impact on students obtaining an education. Stated another way, this argument limits the State's responsibility to that of providing whatever educational experience would be necessary for some theoretical student, without any socioeconomic disadvantages, to obtain the requisite education. In a related argument, the State suggests that the City's expenditure of an average of $9,500 per year per student must necessarily provide the required opportunity for a minimally adequate education.

I do not accept the State's position. First of all, the question of whether a minimally adequate education is being offered to New York City's public school students cannot be answered by considering whether it would be adequate if it were being provided to a theoretical student body consisting only of privileged children. In that case, the form and content of the

education currently being offered generally in New York City might be deemed adequate, despite its many deficiencies. Indeed, there are currently many students in New York City public schools who are obtaining far better than a merely adequate education. However, many of these students are in the City's special academic programs, or are in schools in wealthier districts that receive additional funds from outside corporate and family sources, which districts are more likely to contain families whose members assist and provide support for their children's studies.

To properly weigh whether a minimally adequate education is being offered to New York City's public school students, the actual circumstances and needs of all the students must be considered. It is not enough that a portion of the City's students can obtain an adequate education, where it is demonstrated that another large segment of students is unable to do so, especially when this inability is caused by the school system's failure to provide the necessary programs, facilities and educational approaches due to a lack of sufficient funding.

Nor does the City's average expenditure of approximately $9,500 per student in and of itself establish that a "minimally adequate education" is being offered. As the trial court properly found, this figure is misleading. In fact, given the sums the City schools are required to spend for special education, and the disproportionate number of students receiving special education services, the real amount available to be spent for a non-special education student is far lower.

The City's average per-pupil spending is lower than the average of New York State school districts, and is even low in comparison to the amount spent per student by other large municipal school districts, including Newark, Boston and Buffalo. This disparity is attributable in part to the City's lower contribution, but it is also explained by the State's providing less aid to New York City than it does to many districts with similar needs, even those with substantially smaller proportions of at-risk students. Indeed, the State's "wealth equalization" approach to school funding, by which less affluent districts receive greater funding, actually serves to *decrease* New York City's share of the State's education funding, despite the City's extremely high concentration of students requiring extra assistance.

None of this is to say that the State is answerable where students decline to take the opportunity to learn. The mere fact that many students have failed to obtain even a minimally

adequate education does not alone demonstrate that the City schools failed to offer these students the opportunity to obtain an education; in and of itself, it could simply mean that all those students failed to take advantage of that opportunity.

Nevertheless, plaintiffs' point is that the failure of the New York City school system is not solely attributable to unwilling or uninterested students; they have demonstrated that a large portion of the student population of New York City has been *unable* to obtain an adequate education because of shortcomings in what is offered and how it is offered, due in large part to a lack of funds necessary to successfully provide those New York City students with that which they need in order to obtain a sound basic education.

Once it is recognized that the needs of actual students must be considered in determining whether the requisite education is being offered, the question becomes whether the evidence warrants the conclusion that (1) a substantial segment of the students of the New York City public schools has been unable to obtain a sound basic education, and (2) these students would be able to successfully obtain the education to which they are entitled if the State ensured that the City was able to spend sufficient funds.

What Constitutes a Sound Basic Education

The State argues that despite the poor test results touted by plaintiffs, a sound basic education is being made available since the level of education required by the Education Article amounts to the ability to read and perform arithmetic calculations.

While the Court of Appeals insisted that it did not intend a full definition of what constitutes a sound basic education, it explained the concept generally as consisting of "the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (*see, Campaign for Fiscal Equity*, 86 NY2d 307, 316, *supra*). It went on to explain that the concept requires "minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas" (*id.* at 317). Also required are "minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn," and "access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks" (*id.*).

The trial court heard and considered vast quantities of evidence and found, based upon that evidence, that while "the City's at-risk children are capable of seizing the opportunity for a sound basic education *if* they are given sufficient resources," the resources those at-risk children need in order to successfully obtain an education are currently not being provided. (187 Misc 2d 1, 23 [emphasis added].) Specifically, these children need an "expanded platform" of programs that will allow them to spend "more time on task," including the availability of prekindergarten, so-called "extended time programs" such as after-school and summer programs, and literacy programs such as "Reading Recovery" and "Success for All." (*Id.* at 76-77.) They also need competent teachers adequately trained to teach their subject areas, which, particularly in such difficult circumstances, means teachers who receive ongoing professional development to assist them with instructional strategies.

The conclusion that this large segment of the City's public school students is not, in fact, being given the opportunity to receive even a minimally adequate education, was well supported by the data offered at trial.

Year after year, an extraordinary percentage of New York City public school students demonstrates a lack of basic skills. For instance, large percentages were unable to achieve even the very low competency threshold set for the standardized reading and math tests required by the State for third and sixth graders until 1998, which low thresholds were designed to identify students in need of remedial assistance. Since 1998 the State Education Department has used more rigorous standardized tests keyed to the New York State Regents' new learning standards; on these tests, New York City public school students scored substantially worse than the rest of the State's students.

The State protests that the trial court applied too elevated a standard for defining the elements of a sound basic education. While I, like the majority, would reject the trial court's definition of "function[ing] productively as civic participants" to include the possession of such skills as are necessary to obtain employment paying a "living wage," there is no need to entirely reject the trial court's findings based upon that disagreement. The findings of fact, made upon overwhelming evidence, reflect an educational process that fails to offer far more than merely the skills to get a high-paying job; it fails to offer a large segment of its students the opportunity to obtain sufficient skills

to "function productively as civic participants" in any sense of those words.

I do not accept the proposition that providing students with instruction by which they may achieve sixth-grade arithmetic skills and an eighth-grade reading level is sufficient to satisfy the constitutional requirement that the State provide children with the opportunity to obtain "the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (*see, Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 316). Even defendants agree that the skeletal framework set out by the Court of Appeals requires not only competency at reading, writing, and mathematics, but essentials of reasoning and analysis as well. I also note that if the State's constitutional mandate under the Education Article is satisfied by providing students with low-level arithmetic and reading skills, then logically, it has no meaningful obligation to provide any high school education at all.

Accordingly, while I disagree with the trial court's suggestion that to be "minimally adequate" an education must prepare a student for more than a "low-level job[ ] paying the minimum wage" (187 Misc 2d 1, 15), the facts established by plaintiffs demonstrate a failure to satisfy even the basic parameters set out by the Court of Appeals, which requires "the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (*see, Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 316, *supra*).

I disagree with the majority's suggestion that the evidence "implicates the system of education, not the system of funding." To assert that the problem is with the pedagogy, not the amount of funding, fails to acknowledge plaintiffs' showing that programs proven to succeed with at-risk students have repeatedly needed to be cut back or eliminated *because of a lack of sufficient funds to provide those programs in addition to the basic, "no frills" classroom education in crowded classrooms with large student-teacher ratios, insufficient professional development and poor supplies.*

The majority also interprets my views as suggesting that "almost the entire City student population is 'at risk,'" and reasons that if this is so, the obvious answer is to completely redirect the funding to the type of programs needed by at-risk students. Of course, this line of reasoning is disingenuous. The

City school system has a wide variety of students, one large segment of which needs, and is not getting, a type of focused assistance that the school system has found to be too expensive to provide to all who need it.

Causation

I disagree with the majority's view that plaintiffs failed to prove a causal link between the State's inadequate funding of the New York City public schools and the inability of so many City public school students to obtain an education.

There was substantial evidence that at-risk students who have received the type of resources proposed by plaintiffs have made impressive academic progress. In New York City, 99% of the students who completed the Reading Recovery program were able to read at grade level by the end of the school year, even though they began the year significantly below grade level; a comparison group of at-risk students who did not receive Reading Recovery support only achieved this level for 38% of the group.

Another illustration can be found in the so-called "Chancellor's District," created from the worst performing schools, the successes of which also demonstrate how providing extra funds can dramatically improve the education being obtained by the worst-performing students. The program has taken "discretionary" funds from other parts of the Chancellor's budget and given those schools extra supervision and extra resources, such as implementation of the "Success for All" literacy program. The result in the lower grades was that the students' reading scores climbed faster than in most other New York City schools.

The majority points out that plaintiff's expert "conceded" that investing money in the family rather than the schools "might pay off even more." This assertion, even if true, adds nothing to the analysis. It is the job of the schools to provide all students with the opportunity to obtain at least a basic education, and it is the responsibility of the State to provide enough funding for it to do so. It is irrelevant that other, and perhaps greater accomplishments could be achieved by investing the same funds to provide other kinds of support to those children's families.

The evidence demonstrates that the failure of the New York City public schools to provide a large portion of its students with an education is the direct result of insufficient resources. The lack of funds results not only in insufficient programs for the at-risk students who require extra programs in order to

successfully learn, but additionally, inter alia, in insufficient numbers of qualified, properly certified teachers as well as insufficient support for teachers. For instance, as a direct result of lower teacher salaries than those offered in surrounding districts, as well as worse teaching conditions, New York City is unable to attract the necessary number of qualified, certified teachers. Further, the neediest students, who require the most assistance from their teachers if they are to succeed at obtaining a basic education, are assigned the system's least qualified teachers, since the poorest, neediest students generally reside in the poorer, more dangerous neighborhoods, and, by collective bargaining, teachers with seniority are entitled to transfer into open positions in districts. These less qualified and less experienced teachers then in turn receive insufficient support and supervision, caused in part by the absence of funds in these districts to provide for ongoing professional development of the type most useful in assisting new teachers in succeeding with difficult students.

Chronic underfunding, although interspersed with some years of greater funding, has also led to deterioration of school buildings, overcrowding, inadequacy of textbooks, library materials, laboratory supplies and basic classroom supplies, and, in some schools, even an insufficient number of desks and chairs.

The majority concludes that it is not the State's underfunding, but rather, the Board of Education's misuse of funds, that is the cause of the City schools' inability to fund the necessary programs. This approach fails to recognize that redirecting the already allocated funds from one program to another would simply create other problems caused by underfunding to spring up elsewhere.

Notably, the majority does not accept the State's argument that the Board of Education is actually chargeable with waste or abuse of funds. Rather, it emphasizes the testimony that millions of dollars could be saved by reassignment into the general school population of students who were improperly assigned to special education programs.

There was evidence indicating that possibly tens of thousands of the 135,000 students in special education were improperly placed there, and that a majority of students classified as learning disabled do not meet the definition of that term. I agree with the proposition that students ought to be placed in the least restrictive educational environment. However, we cannot assume that if these students were to be removed from their

special education programs they would be reabsorbed within the general student population at no further additional expense to the Board of Education. This is not to suggest that there would be no savings at all if all students were properly placed in the least restrictive environment. It should be acknowledged, though, that whether or not the students at issue fall within the formal definition of "learning disabled" or "special education students," most of them were diagnosed and/or placed as they were precisely because the standard teaching approach, used for the general student population, was not successful with those students. Consequently, changing their placement would not necessarily result in the extent of savings the majority so optimistically suggests.

The trial court therefore appropriately concluded that although there would be substantial savings (between $105 million and $335 million) in the sums directly funneled to the special education program if all students were properly placed, it also correctly recognized that nevertheless, much of this amount would *not* then become available to be spent on the type of programs demonstrably needed here.

In sum, the evidence demonstrates that which the trial court found, namely, that New York City's large number of at-risk students are not receiving the "sound basic education" to which they are entitled, that in order for at-risk students to have the opportunity for academic success, they must be provided with sufficient resources and programs with which they currently are not being provided, and that this deficiency is caused by insufficient resources resulting from inadequate funding. No "presumption of unconstitutionality" is being applied here. Rather, the evidence amply supports the conclusion that the level of funding provided to the New York City public school system is at a level so low as to violate the Education Article of the New York State Constitution (NY Const, art XI, § 1).

Accordingly, I would affirm to the extent that the trial court found that defendants have violated the Education Article of the New York State Constitution by failing to provide a substantial portion of its students with the opportunity to obtain a sound basic education.

In view of this, I would affirm the provision of the judgment which directs the State to determine the actual cost of providing City public schools with the programs they need in order to be able to give all their students the opportunity to obtain an education. Such costs would include the extended platform of programs needed by at-risk children, and the type of teacher

development programs that assist new and inexperienced teachers develop the skills they need to successfully educate their students.

The State must then ensure that those necessary funds are provided. To the extent the State believes it is the City's responsibility to provide additional funds, under the Education Article, the State has the responsibility to enact and enforce the legislation to bring that about.

However, those provisions of the judgment requiring defendants to alter the statewide funding mechanisms go beyond the relief sought. Laudable a goal as that may be, the purpose of this lawsuit was to ensure sufficient funding for the New York City public schools, and any other relief, no matter how beneficial, is uncalled for.

Finally, I agree with the majority's rejection of plaintiffs' claims under title VI's implementing regulations.

Motions seeking leave to file amicus curiae briefs granted.

BUCKLEY and SULLIVAN, JJ., concur with LERNER, J.; TOM, J.P., concurs in a separate opinion; and SAXE, J., dissents in part in a separate opinion.

Order and judgment (one paper), Supreme Court, New York County, entered January 31, 2001, reversed, on the law and the facts, without costs, a declaration made in favor of the State of New York that the State's educational funding system does not contravene the constitutional Education Article, and the claim under the Department of Education implementing regulations and 42 USC § 1983 dismissed. Motions seeking leave to file amicus curiae briefs granted.