OPINION OF THE COURT
Chief Judge Kaye.
We begin with a unanimous recognition of the importance of education in our democracy. The fundamental value of education is embedded in the Education Article of the New York State Constitution by this simple sentence: “The legislature shall provide for the maintenance and support of a system of *902 free common schools, wherein all the children of this state may be educated” (NY Const, art XI, § 1). Plaintiffs claim that the State has violated this mandate by establishing an education financing system that fails to afford New York City’s public schoolchildren the opportunity guaranteed by the Constitution. Plaintiffs additionally claim that the State’s method of school funding in New York City violates their rights under United States Department of Education regulations pursuant to title VI of the Civil Rights Act of 1964 (42 USC § 2000d et seq.; 34 CFR 100.3 [b] [2]).
This case does not arrive before us on a blank slate. On June 15, 1995 — precisely eight years ago — we denied the State’s motion to dismiss plaintiffs’ claims, thereby resolving three issues of law that now become the starting point for our decision (Campaign for Fiscal Equity v State of New York, 86 NY2d 307 [1995] [CFE]).
First, echoing Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27 [1982] [Levittown]), in CFE we recognized that by mandating a school system “wherein all the children of this state may be educated,” the State has obligated itself constitutionally to ensure the availability of a “sound basic education” to all its children. (86 NY2d at 314.) Second, we made clear that this Court is responsible for adjudicating the nature of that duty, and we provided a template, or outline, of what is encompassed within a sound basic education. And third, we concluded from the pleadings that plaintiffs had alleged facts that, if proved, would constitute a violation of the State’s constitutional duty as well as the federal regulations. The actual quality of the educational opportunity in New York City, the correlation between the State’s funding system and any failure to fulfill the constitutional mandate, and any justification for claimed discriminatory practices involve fact questions. For that reason, we remitted the matter to the trial court for development of the record. Extensive discovery ensued. Trial commenced on October 12, 1999 and the last witness left the stand seven months later, on May 15, 2000.
Based on the testimony of 72 witnesses and on 4,300 exhibits, the trial court on January 9, 2001 determined that the State over many years had consistently violated the Education Article of the Constitution. In keeping with our directive, the trial court first fleshed out the template for a sound basic education that we had outlined in our earlier consideration of the issue. To determine whether the State actually satisfied that standard the court then reviewed the various necessary *903 instructional “inputs” we had identified, and concluded that in most of these the New York City schools were deficient. The trial court further held that the “outputs” — test results and graduation rates — likewise reflected systemic failure and that the State’s actions were a substantial cause of the constitutional violation. Finally, the court found a violation of title VI, and directed defendants to put in place systemic reforms.
A divided Appellate Division reversed, on the law and facts. The majority rejected the trial court’s definition of a sound basic education, as well as the bulk of Supreme Court’s findings of fact concerning inputs, outputs and causation. Lastly — and on this point the panel was united — the Appellate Division concluded that plaintiffs’ title VI claim failed in light of Alexander v Sandoval (532 US 275 [2001]), which postdated the trial court’s decision. Plaintiffs appealed to us as of right on constitutional grounds.
Plaintiffs’ appeal presents various questions of law, but one is paramount: whether the trial court correctly defined a sound basic education. Further — in light of the Appellate Division’s express and implicit substitution of its findings of fact for those of the trial court regarding the inputs, outputs and causation — we must determine which court’s findings more nearly comport with the weight of the credible evidence (see CPLR 5501 [b]). We now modify, affirming for reasons stated by the Appellate Division so much of the decision as dismissed plaintiffs’ title VI claim,[1] and otherwise reversing the Appellate Division’s order (see, by contrast, Paynter v State of New York, 100 NY2d 434 [2003] [decided today]).
I. Overview
At the time of trial, the New York City public school system comprised nearly 1,200 schools serving 1.1 million children and employing a staff of over 135,000, including 78,000 teachers (see generally 187 Misc 2d 1, 19-23 [2001]; 295 AD2d 1, 5-6 [2002]). Some 84% of City schoolchildren were racial minori *904 ties; 80% were born outside the United States; and 16% were classified as Limited English Proficient (LEP — persons who speak little or no English) — most of the state’s students in each of these categories. Upwards of 73% were eligible for the federal free or reduced price lunch program; 442,000 City schoolchildren came from families receiving Aid to Families with Dependent Children; and 135,000 were enrolled in special education programs.
The New York City public school system was and is supervised by the Board of Education and its Chancellor (see Education Law § 2590-b [1]; §§ 2590-g, 2590-h).[2] The system is divided into 32 geographically-based community school districts to provide elementary and middle school education; six geographically-based high school districts; and four nongeographical districts. At the time of trial, elected community school boards supervised the community school districts, and had done so since 1969. Statewide, oversight of the public school system is vested in the Regents of the University of the State of New York (see NY Const, art XI, § 2; Education Law § 207). The State Education Department (SED) and Commissioner of Education supervise and manage the State’s public schools, promulgating regulations and determining teaching standards and curricula, among other things.
Neither the Regents nor the SED is responsible, however, for the day-to-day operation of the schools or for their funding. Rather, a combination of local, state and federal sources generates school funding. Almost half of the state aid component consists of operating aid, which is allocated using a complex statutory formula that apportions various categories of aid based on a district’s combined wealth ratio — which measures its ability to generate revenue — and student attendance (see Education Law § 3602). The statute contains extensive prescriptions regarding how districts may use funds, and it is perhaps the proliferation of highly specific aid categories that most differentiates the current section 3602 from its shorter, simpler predecessors (see e.g. L 1962, ch 657, § 3).
Every year, pursuant to Education Law § 215-a, the Board of Regents and the SED submit a report to the Governor and Legislature on the educational status of the State’s schools. *905 The most recent of these “655 Reports” at the time of trial— that of April 1999 — provides a comprehensive statistical view of the funding system as of the 1996-1997 school year, the last year for which the record provides such a complete picture. That year, statewide, the State provided 39.9% of all public school funding — $10.4 billion out of a total of $26 billion— while districts provided 56% and the federal government four percent. These figures represented an investment of $9,321 per pupil, $3,714 of it by the State. Per-pupil expenditures in the New York City public schools, at $8,171, were lower than in three quarters of the State’s districts, including all the other “large city” districts, as classified by the SED. The State’s dollar contribution to this figure was also lower, at $3,562, than its average contribution to other districts; and the City’s, at about $4,000, was likewise lower than the average local contribution in other districts.
II. The Standard
In CFE we equated a sound basic education with “the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury” (86 NY2d at 316). We thus indicated that a sound basic education conveys not merely skills, but skills fashioned to meet a practical goal: meaningful civic participation in contemporary society. This purposive orientation for schooling has been at the core of the Education Article since its enactment in 1894. As the Committee on Education reported at the time, the “public problems confronting the rising generation will demand accurate knowledge and the highest development of reasoning power more than ever before * * *” (2 Documents of 1894 NY Constitutional Convention No. 62, at 4).
In keeping with this core constitutional purpose and our direction further to develop the template, the trial court took evidence on what the “rising generation” needs in order to function productively as civic participants, concluding that this preparation should be measured with reference to the demands of modern society and include some preparation for employment (187 Mise 2d at 16). The Appellate Division also recognized that our “term ‘function productively’ does imply employment” (295 AD2d at 8), and we agree with both parties and both lower courts that an employment component was implicit in the standard we outlined in CFE. Nevertheless, the parties dispute the nature of the employment — and of civic participa *906 tion generally — for which a sound basic education should prepare children, as well as the nature of the instruction necessary to achieve such preparation. We address each of these areas of dispute in turn.
First, as to employment, the Appellate Division concluded that the trial court “went too far” in construing the ability to “function productively” as the ability to obtain “competitive employment” or, indeed, as anything more than “the ability to get a job, and support oneself, and thereby not be a charge on the public fisc” (295 AD2d at 8). More is required. While a sound basic education need only prepare students to compete for jobs that enable them to support themselves, the record establishes that for this purpose a high school level education is now all but indispensable. As plaintiffs’ education and economics expert Dr. Henry Levin testified, manufacturing jobs are becoming more scarce in New York and service sector jobs require a higher level of knowledge, skill in communication and the use of information, and the capacity to continue to learn over a lifetime. The record showed that employers who offer entry-level jobs that do not require college increasingly expect applicants to have had instruction that imparts these abilities, if not a specific credential.
Second, as to other aspects of civic participation, the difference between the trial court and the Appellate Division centers on our statement in CFE that a sound basic education should leave students “capable of voting and serving on a jury” (86 NY2d at 316). The State’s expert on educational psychology, Dr. Herbert Walberg, testified that pattern jury instructions and newspaper articles typically feature vocabulary and sentence length comparable to those of texts eighth-graders are expected to be able to read. Based on this testimony, the Appellate Division concluded that the skills necessary for civic participation are imparted between eighth and ninth grades (295 AD2d at 8). The trial court, by contrast, concluded that productive citizenship “means more than just being qualified to vote or serve as a juror, but to do so capably and knowledgeably” (187 Mise 2d at 14 [emphasis in original]) — to have skills appropriate to the task.
We agree with the trial court that students require more than an eighth-grade education to function productively as citizens, and that the mandate of the Education Article for a sound basic education should not be pegged to the eighth or ninth grade, or indeed to any particular grade level. In CFE we pointed to voting and jury service because they are the civic re *907 sponsibilities par excellence. For reasons founded in the American historical experience, the statutory requirements for participation in those activities are aimed at being inclusive. Indeed, the latest amendment of Judiciary Law § 510 — the juror qualification statute — removed requirements based on jurors’ literacy (see L 1995, ch 86, § 3). Yet it cannot reasonably be supposed that the demands of juror service, and any related demands on the City schools, have become less rigorous, or that the concept of a sound basic education would not include literacy.
Finally, with these goals in mind, we come to the dispute over the kind and amount of schooling children need in order to be assured of the constitutional minimum of educational opportunity. In CFE we refrained from addressing this problem in detail, simply setting forth the “essentials”:
“Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas” (86 NY2d at 317).
As we further explained, many of the more detailed standards established by the Board of Regents and Commissioner of Education “exceed notions of a minimally adequate or sound basic education,” so that proof that schools do not comply with such standards “may not, standing alone, establish a violation of the Education Article” (id.). The trial court, accordingly, declined to fix the most recent, and ambitious, statement of educational goals — the Regents Learning Standards, adopted in 1996 — as the definition of a sound basic education (187 Mise 2d at 12). As the trial court observed, so to enshrine the Learning Standards would be to cede to a state agency the power to define a constitutional right.
Although some amici nevertheless urge us to adopt the Learning Standards as the definition of a sound basic education, plaintiffs make no such request. Rather, they contend that children are entitled to a meaningful high school educa *908 tion, one that provides the essentials we listed. Defendants maintain that plaintiffs are trying to set the requirements for a high school diploma as the constitutional floor, and thereby to make mastery of the Learning Standards — which are being phased in as the basis for a high school diploma (see 8 NYCRR 100.5) — the test of a sound basic education after all. We do not construe plaintiffs’ arguments as a request for a rule tied to whatever diploma requirement the Regents promulgate, however high; nor do plaintiffs need such a rule to prevail.
The issue to be resolved by the evidence is whether the State affords New York City schoolchildren the opportunity for a meaningful high school education, one which prepares them to function productively as civic participants. This is essentially the question the trial court addressed, and we conclude that the Appellate Division erred to the extent that it founded a judgment for defendants upon a much lower, grade-specific level of skills children are guaranteed the chance to achieve.
III. The Evaluation
To determine whether New York City schools in fact deliver the opportunity for a sound basic education, the trial court took evidence on the “inputs” children receive — teaching, facilities and instrumentalities of learning — and their resulting “outputs,” such as test results and graduation and dropout rates. This organization of the facts follows naturally from our summary of the “essentials” in CFE and was not disputed by the Appellate Division.[3]
*909 A. Input
Teaching. The first and surely most important input is teaching. The trial court considered six measures of teacher quality — including certification rates, test results, experience levels and the ratings teachers receive from their principals— and concluded that the quality of New York City schoolteachers is inadequate, despite the commendable, even heroic, efforts of many teachers. The Appellate Division reached a contrary conclusion based on its perception that principals’ reviews of the teachers they supervise are the best indication of teaching ability (295 AD2d at 14). But plaintiffs’ expert on the labor market for teachers, Dr. Hamilton Lankford, testified authoritatively regarding other factors that are probative of teacher quality, and several experienced administrators testified that principals’ reviews tend to conceal teacher inadequacy because principals find it difficult to fire bad teachers and to hire better ones. In our view, the Appellate Division improperly narrowed the inquiry here. Considering all of the factors, we agree with the trial court’s findings and its conclusion that the teaching is inadequate.
The 1999 655 Report noted that schools with the highest percentages of minority children “have the least experienced teachers, the most uncertified teachers, the lowest-salaried teachers, and the highest rates of teacher turnover.” The same report showed that well over half of the State’s minority children attended New York City schools; that 84% of New York City schoolchildren were minorities; and that most of these children are poor. Taken together, these and other facts and statements in the 655 Report amount to an admission by the state agencies responsible for education that — with respect to teacher experience and retention, certification and pay — New York City schools are inferior to those of the rest of the state.
To be sure, the Education Article guarantees not equality but only a sound basic education (see Levittown, 57 NY2d at 48). But as Judge Levine observed in his concurrence in CFE, “the constitutional history of the Education Article shows that the objective was to ‘make[ ] it imperative on the State to provide adequate free common schools for the education of all of the children of the State’ and that the new provision would have an impact upon ‘places in the State of New York where the common schools are not adequate’ ” (86 NY2d at 327 [Levine, J., concurring], quoting 3 Revised Record of Constitutional Convention of 1894, at 695 and adding emphasis).
*910 The 655 Report indicates a mismatch between student need in New York City and the quality of the teaching directed to that need, and it is one authoritative source of facts showing the extent of the mismatch. The report, for instance, shows that in 1997 17% of New York City public schoolteachers either were uncertified or taught in areas other than those in which they were certified. The trial court noted this fact and evidence that uncertified and inexperienced teachers tend to be concentrated in the lowest performing schools. Notably, Dr. Lankford demonstrated not only that New York City schools had the largest percentage of teachers with two or fewer years’ experience but also that this percentage was greatest — at 17.9% — in the quintile of City schools with greatest student need. Classifying teachers who either were uncertified or had less than three years’ experience as novice teachers, Dr. Lankford testified that nearly a quarter of all City teachers, and nearly a third of the teachers in the neediest quintile of City schools, were novices. And he reviewed the colossal failure rates of City teachers on the State’s certification content-specialty tests, which rise above 40% in mathematics, even for math teachers currently teaching in New York City public schools.
As the trial court’s decision shows, the record contains many more facts proving a serious shortfall in teacher quality in New York City schools, proving that this shortfall results from those schools’ lack of competitiveness in bidding for and retaining personnel, and proving that better teachers produce better student performance (see 187 Mise 2d at 25-36).
On this last point the testimony of Dr. Ronald Ferguson is particularly revealing. Using data from Texas — where all teachers are tested — Dr. Ferguson demonstrated that in districts where teachers perform badly on teacher certification tests, student performance declines as student grade level rises — and, conversely, that where teachers test well, student performance at higher grade levels surpasses student performance at lower grade levels. Thus, the longer students are exposed to good or bad teachers, the better or worse they perform. Based on evidence offered by Dr. Lankford, Dr. Ferguson projected that the same correlation would apply in New York. Defendants’ expert, Dr. Eric Hanushek, challenged Dr. Ferguson’s conclusions, but the trial court rejected this challenge and the Appellate Division — though it referred to Dr. Ferguson’s testimony — did not rest any of its own contrary findings on Dr. Hanushek’s testimony.
*911 In sum, we conclude that the Appellate Division erred in relying solely on principals’ evaluations, and we agree with the trial court’s holdings that teacher certification, test performance, experience and other factors measure quality of teaching; that quality of teaching correlates with student performance; and that New York City schools provide deficient teaching because of their inability to attract and retain qualified teachers.
School Facilities and Classrooms. As we noted in CFE, children are entitled to “classrooms which provide enough light, space, heat, and air to permit children to learn” (86 NY2d at 317). The trial court divided this further — considering first the physical plant of New York City schools, and then the specific problem of overcrowding and class size — and concluded that New York City schools are deficient. The court conceded, however, that the harmful effect of physical deficiencies of the first kind on student performance is difficult to measure. The Appellate Division took note of this concession, dismissed as “anecdotal” plaintiffs’ evidence of “leaky roofs, deficient heating, and other problems,” and credited testimony that “all immediately hazardous conditions had been eliminated” (295 AD2d at 10).
Eliminating immediate hazards is not the same as creating an environment conducive to learning, and the record contains much evidence about deficient school infrastructure. Nevertheless, on this record it cannot be said that plaintiffs have proved a measurable correlation between building disrepair and student performance, in general.[4]
On the other hand, plaintiffs presented measurable proof, credited by the trial court, that New York City schools have excessive class sizes, and that class size affects learning. Even in the earliest years — from kindergarten through third grade— over half of New York City schoolchildren are in classes of 26 *912 or more, and tens of thousands are in classes of over 30. As the trial court noted, federal and state programs seek to promote classes of 20 or fewer, particularly in the earliest years, and plaintiffs’ experts testified on the advantage of smaller classes. As the 1999 655 Report shows, New York City elementary school classes average five more pupils than those of other schools statewide excluding Buffalo, Rochester, Syracuse and Yonkers.
Although the Appellate Division found “no indication that students cannot learn in classes consisting of more than 20 students” (295 AD2d at 11), plaintiffs’ burden was not to prove that some specific number is the maximum class size beyond which children “cannot learn.” It is difficult to imagine what evidence could ever meet a burden so formulated; nothing in CFE required plaintiffs to do so. Rather, plaintiffs alleged “fact-based * * * inadequacies” in educational inputs, and we held that the State’s failure to provide the opportunity to obtain “fundamental skills” would constitute a violation of the Education Article (86 NY2d at 319). Accordingly, plaintiffs had to show that insufficient funding led to inadequate inputs which led to unsatisfactory results.
Plaintiffs’ education evaluation statistics expert Dr. Jeremy Finn showed — on the basis of the Tennessee Student Teacher Achievement Ratio (STAR) project and related research — that, holding other variables constant, smaller class sizes in the earliest grades correlate with better test results during those years and afterwards (187 Mise 2d at 52-53). The trial court found that the State’s expert Dr. Hanushek failed to rebut these conclusions, and the Appellate Division, mistakenly addressing a nonexistent claim “that classes of over 20 students are unconstitutional” (295 AD2d at 11), set forth no acceptable basis to disturb the trial court’s finding.[5] We conclude that plaintiffs’ evidence of the advantages of smaller class sizes supports the inference sufficiently to show a meaningful correlation between the large classes in City schools and the outputs to which we soon turn. In sum, the Appellate Division erred in concluding that there was not “sufficient proof’ (295 AD2d at 11) that large class sizes negatively affect student performance in New York City public schools.
*913 Instrumentalities of Learning. The final input is “instrumentalities of learning,” including classroom supplies, textbooks, libraries and computers. The courts below agreed that the textbook supply is presently adequate and the evidence on classroom supplies is inconclusive. On the other hand, evidence including the latest 655 Report showed that New York City schools had about nine library books per student — half as many as schools statewide excluding the City, and just under half the number recommended by the American Library Association. In light of Levittown, the intrastate inequality does not prove anything in itself, and a library association might be expected to advocate book purchases at levels exceeding the constitutional floor. But in holding that the library books in New York City schools are “inadequate in number and quality” (187 Mise 2d at 57) the trial court clearly relied on the abundant testimony on the adequacy of the books for pedagogical purposes rather than on purely numerical intrastate comparisons.
The unrebutted testimony indicated that the books in City school libraries are old and not integrated with contemporary curricula. The Appellate Division suggested that school libraries simply consist of “classics” rather than “multicultural” books (295 AD2d at 12), but the record contains not one scintilla of evidence that antiquated books in City school libraries are “classics.” The Appellate Division thus gave no factual basis for its disagreement with the trial court that the library books in New York City schools are inadequate in quality.
The record concerning computers is similar, establishing that some exposure to them has become essential and that City schools not only have about half as many computers per student as all other New York schools, but also have aging equipment that, in some cases, simply cannot support presently-available software. The Appellate Division speculated that old equipment might be used “for introductory classes” (295 AD2d at 11), but this possibility was not even advocated by the State and, like the “classic” outdated library books, has no record support at all. While we hesitate to overstate the importance of libraries and computers relative to other inputs, we conclude that as to these two instrumentalities of learning the trial court’s findings again better comport with the weight of the evidence, and support its conclusion that the New York City schools are deficient in instrumentalities of learning.
In sum, considering all of the inputs, we conclude that the trial court’s findings should be reinstated, as indicated, and *914 that the educational inputs in New York City schools are inadequate. There are certainly City schools where the inadequacy is not “gross and glaring” (Levittown, 57 NY2d at 48). Some of these schools may even be excellent. But tens of thousands of students are placed in overcrowded classrooms, taught by unqualified teachers, and provided with inadequate facilities and equipment. The number of children in these straits is large enough to represent a systemic failure. A showing of good test results and graduation rates among these students — the “outputs” — might indicate that they somehow still receive the opportunity for a sound basic education. The showing, however, is otherwise.
B. Outputs
School Completion. Concerning the first output, school completion, the proof revealed that of those New York City ninth graders who do not transfer to another school system, only 50% graduate in four years, and 30% do not graduate or receive a general equivalency degree (GED) by the age of 21, when they cease to be eligible for free public education. This rate of school completion compares unfavorably with both state and national figures, and the trial court considered it symptomatic of “system breakdown” (187 Mise 2d at 63). The Appellate Division concluded that “there was no evidence quantifying how many drop-outs fail to obtain a sound basic education” (295 AD2d at 15). That conclusion follows from the Appellate Division’s premise that a sound basic education is imparted by eighth or ninth grade. A sound basic education, however, means a meaningful high school education. Under that standard, it may, as a practical matter, be presumed that a dropout has not received a sound basic education. In any event the evidence was unrebutted that dropouts typically are not prepared for productive citizenship, as the trial court concluded.[6] The Appellate Division would have required a precise quantitative division between those dropouts who somehow are adequately *915 prepared and those who are not, but such a requirement is nowhere to be found in CFE.
The State argues nonetheless that it is responsible only to provide the opportunity for a sound basic education and cannot be blamed if some students — perhaps those who enter New York City schools after years of schooling in another country — do not avail themselves of the opportunity it provides. As the trial court correctly observed, this opportunity must still “be placed within reach of all students,” including those who “present with socioeconomic deficits” (187 Mise 2d at 63). This observation follows from the constitutional mandate to provide schools wherein all children may be educated, and is consistent with the official position of the Regents and Education Department, as set forth in the 655 Report for 1999, that “[a] 11 children can learn given appropriate instructional, social, and health services.”
The evidence on why students drop out suggested mainly that the choice to drop out correlates with poor academic performance and, as noted in the 655 Report for 1999, racial minority status and concentrated poverty. The Report further indicated that “dropout rates serve as useful measures of schools’ abilities to * * * motivate learning,” supporting the commonsense proposition that large dropout rates reflect problems with the schools as well as the students. The trial court properly considered both possibilities and declined to pin the blame solely on the deficits a “troubled child” brings to school (see 187 Mise 2d at 63). There was certainly no proof that dropout rates are high because inordinate numbers of recent immigrants enter the ninth grade unable ever to graduate, though such students may take longer to graduate.[7] Moreover, as the trial court properly observed, “education is cumulative,” and the State’s hypothesis that poor completion rates stem from the educational deficits of teenage immigrant students does not jibe with the significant evidence that New York City schoolchildren begin to accumulate learning deficits well before high school (187 Mise 2d at 63).
Test Results. The State’s main answer to the proof of graduation and dropout rates in City schools consists of evidence that, in any event, test results are not bad — and this is also *916 where the Appellate Division concentrated its discussion of outputs (295 AD2d at 15-16).
The State’s reliance on some favorable standardized test results fails to take into account the full record on examination evidence. In particular, that evidence related to elementary school tests administered statewide and intended to present results with reference to the content appropriate to their grade level: the Pupil Evaluation Program (PEP), which measures individual achievement in reading and mathematics, and the Program Evaluation Test (PET), which measures performance in other subjects. As the trial court explained, the PEP measures student performance relative to a particular score, the state reference point (SRP) (187 Mise 2d at 65). The particular examination used for the PEP reading test during most of the 1990s was the Degrees of Reading Power (DRP). The DRP was replaced in 1998 because it was considered too elementary, in that over 90% of children outside New York City scored above the SRP, so that the exam was inadequate as a means of distinguishing fair from good and good from excellent students. As a means, however, of identifying students in need of remedial attention, the DRP was adequate: a score below the SRP signaled need for improvement.
Between 1994 and 1998, the undisputed evidence showed that upwards of 30% of New York City sixth graders scored below the SRP in reading. Among third graders, 35 to 40% scored below the SRP, while in the rest of the state about 90% scored above. The evidence showed that at the third grade level — when children are expected to have learned to read — a score at the SRP means a child is barely literate, and hence that over a third of City schoolchildren were functionally illiterate. PET scores in science and social studies showed New York City fourth, sixth and eighth graders invariably in the lowest quartile statewide, and generally between the 10th and 16th percentile. The trial court attached significance to these low PEP and PET scores (187 Mise 2d at 65-66). It also properly recognized that — as always — City-wide averages reflect a process of aggregation wherein some successful schools and districts balance others where even larger numbers of pupils score below the SRP (id.). The Appellate Division set forth no basis to challenge the trial court’s analysis of this output, other than its belief that courts should “look at the nation as a whole,” rather than to test result comparisons within New York State (295 AD2d at 16). We reject this exclusive focus on national comparisons because the record provides no informa *917 tion on how many students receive a sound basic education nationwide.
The State does rely partly on tests administered statewide. In particular, it cites student performance on the Regents Competency Tests (RCTs), which have historically been administered to 11th graders as a prerequisite for graduation. In 1997-1998, 90% of the New York City schoolchildren who reached 11th grade demonstrated competency in reading and mathematics by passing either the RCTs or the more challenging Regents examinations — a figure not far behind the statewide and suburban averages.
Although the RCTs are no longer used to measure readiness to graduate, this fact alone does not disqualify them as a measure of whether students have received a sound basic education. Nevertheless, as both parties agree, the RCTs assess achievement at only an eighth or ninth grade level in reading and a sixth-to-eighth grade level in math. Thus, while passing the RCTs may show that students have received a sound basic education as defined by the Appellate Division, it does not prove that they have received a meaningful high school education, as the trial court concluded (187 Mise 2d at 61).
Additionally, according to the 655 Report for 1999, City students who took the RCTs in 1997-1998 actually passed at a much lower rate than 90%; 51% passed in math and 72% in English. The Report explains that City schools had adopted a new policy of administering the examinations to ninth rather than 11th graders, and this may account for some of the difference. Since the exams are a diagnostic tool for measuring skills taught in middle school, these results, at most, cast doubt on the results middle schools accomplish, rather than proving that students have received a meaningful high school education. Further, the 1997-1998 11th grade class with the 90% qualification rates consisted of only about 40,000 students, compared to a ninth grade enrollment of over 90,000.
Thus the state’s RCT passage rates — aside from proving nothing about high school achievement — would surely be lower, but for the alarming number of students who fall behind or drop out and so do not take the exam. This fact illustrates the need to be cautious in relying on test results, a point we made in CFE even as we recognized that such results have some value (86 NY2d at 317). The trial court properly exercised such caution in its discussion of test results, noting that the failure of many students to be promoted diminishes the value of evidence that students test at grade level (187 Misc 2d at 67).
*918 Apart from the RCTs, the State relies on results from an assortment of commercially-available nationally-normed reading and math tests administered to children in City elementary schools, notably the CTB-Reading (CTB-R) and California Achievement Test (CAT). As the State points out, just under half of all City schoolchildren score at or above the 50th percentile in reading, and a larger number do so in math. Plaintiffs counter that these , exams are “norm-referenced”— they present information only on how students perform relative to other students — in contrast to “criterion-referenced” exams, which are informative about how students master content they are expected to know at a given level. Further, plaintiffs argue that national comparisons are irrelevant to the issue of whether New York City public school students have received a sound basic education. The Appellate Division rejected this argument (295 AD2d at 16).
As we have already suggested, the New York Constitution ensures students not an education that approaches the national norm — whatever that may be — but a sound basic education. Moreover, CFE makes clear that the measure of a sound basic education is educational content — the set of “basic literacy, calculating, and verbal skills” children acquire and its fit with the goal of productive citizenship (86 NY2d at 316). Of course, results on a national norm-referenced exam may be translatable into a measure of the skills students must master to have a sound basic education, and we have no cause to doubt that the CTB-R and CAT are designed, as the State argues, to measure mastery of curricula considered important in New York as well as nationally. But during the years reflected in the record, the scores of City schoolchildren on these exams were reported — as the State admits — with reference to a norm rather than to achievement levels. The State has not shown how to translate these results into proof that the schools are delivering a sound basic education, properly defined. Thus, while we cannot say that the CTB-R and CAT exam results have no place in the mix of information on outputs, on this record the Appellate Division erred in according primacy to these results.
In sum, the Appellate Division improperly relied on the RCTs in that they measure a level of proficiency far below a sound basic education, and, as to exams administered to younger children, it erred in relying on national norm-referenced exam results without evidence tying these results to the constitutional standard. We conclude that the trial court’s assessment of exam results, like its assessment of completion rates, better *919 comports with the weight of the credible evidence, and supports its conclusion that, whether measured by the outputs or the inputs, New York City schoolchildren are not receiving the constitutionally-mandated opportunity for a sound basic education.
IV. Causation
As we noted in CFE, in order to prevail plaintiffs must “establish a correlation between funding and educational opportunity * * * a causal link between the present funding system and any proven failure to provide a sound basic education to New York City school children” (86 NY2d at 318). The trial court reasoned that the necessary “causal link” between the present funding system and the poor performance of City schools could be established by a showing that increased funding can provide better teachers, facilities and instrumentalities of learning (187 Mise 2d at 68). We agree that this showing, together with evidence that such improved inputs yield better student performance, constituted plaintiffs’ prima facie case, which plaintiffs established.
That the trial court’s “Causation” section is largely devoted to the State’s rebuttal arguments, rather than to plaintiffs’ prima facie case, is insignificant, in that the court had already incorporated much of the correlation evidence in its discussion of inputs and outputs, as we have done. The trial court, for instance, concluded that teacher certification rates are one valid measure of teaching quality and are too low in New York City, and it founded these conclusions on evidence establishing the correlation between teacher certification and performance (187 Mise 2d at 26-27). The Appellate Division speculated about the significance of certification and noted that more certified teachers will be hired “[i]n any event” (295 AD2d at 12), but its only clear holding about the quality of instruction — which we reject — was that principals’ ratings of teachers should be the preeminent measure of pedagogical quality and, implicitly, that by this measure the teaching input is adequate (id. at 13-14). The Appellate Division did nothing to undermine the rest of the trial court’s syllogism: that better funded schools would hire and retain more certified teachers, and that students with such teachers would score better.[8] The same is true with respect to class size and instrumentalities of learning.
*920 We thus have no occasion to repeat the evidence establishing plaintiffs’ prima facie case regarding the causal connection between better funding, improved inputs and better student results.
The State nevertheless makes several further arguments concerning the correlation between its funding scheme and the educational results. Most of these points, however, more properly concern the apportionment of responsibility among various government actors than causation. In any event, the trial court interpreted CFE correctly when it said that the “law recognizes that there may be many ‘causal links’ to a single outcome, and there is no reason to think that the Court of Appeals 1995 opinion mandates a search for a single cause of the failure of New York City schools” (187 Misc 2d at 92).
Socioeconomic Disadvantage. The State argues that poor student performance is caused by socioeconomic conditions independent of the quality of the schools and better remedied with investment in other resources. The Appellate Division agreed, reasoning that because of “demographic factors, such as poverty, high crime neighborhoods, single parent or dysfunctional homes, homes where English is not spoken, or homes where parents offer little help with homework and motivation * * * more spending on education is not necessarily the answer, and * * * the cure lies in eliminating the socioeconomic conditions facing certain students” (295 AD2d at 16). This is partly an argument about why students fail, which we have rejected in the discussion of outputs. But it is also a distinctly constitutional argument in the sense that choosing between competing beneficial uses of funds is a legislative task.
This is, in fact, the argument that Judge Simons made in his solitary dissent in CFE (86 NY2d at 342-343). Had we accepted the argument, we would have saved everyone considerable effort and expense by dismissing the case on the spot. We did not do so. Decisions about spending priorities are indeed the Legislature’s province, but we have a duty to determine whether the State is providing students with the opportunity for a sound basic education. While it may be that a dollar spent *921 on improving “dysfunctional homes” would go further than one spent on a decent education, we have no constitutional mandate to weigh these alternatives. And, again, we cannot accept the premise that children come to the New York City schools ineducable, unfit to learn.
Comparative Spending. The State next argues that per-student expenditures in the New York City schools compare favorably with the average in the United States generally and in other large cities such as Los Angeles, a fact purportedly incompatible with finding “gross and glaring inadequacy” in education (see Levittown, 57 NY2d at 48). The premise is that some expenditure level, if high enough relative to figures nationwide, simply must be “enough,” without reference to student need, local costs, and the actual quality of inputs and outputs. This premise, also, is compatible with the interpretation of Levittown endorsed by the dissent in CFE (86 NY2d at 337-338) and apparently also today’s dissent (dissenting op at 954). We reject it for much the same reason we rejected exclusive reliance on nationally-normed tests — the record discloses no information on whether those students are receiving a sound basic education.
City Mismanagement. The State’s most sustained arguments on causation, however, are based on evidence that the Board of Education mismanages New York City schools and the City itself fails to devote a sufficient part of its revenues to them. The State reasons that if either proposition is true, then the cause of any shortage of educational inputs in City schools is not the state funding system but City bureaucracy.
Specifically, the State argues first that fraud and corruption in the community school boards and City school construction spending, rather than the funding system, are the cause of any shortage of inputs. The trial court rejected these arguments (187 Mise 2d at 92, 94) and the Appellate Division likewise rejected the point about construction spending (295 AD2d at 18) while saying nothing about the community school boards. We thus have no occasion to review either argument.
The State argues second that, corruption aside, the Board of Education mismanages the schools, particularly by referring too many students to special education and placing too many of these children in costly full-time segregated settings. The trial court credited evidence that better special education practices could save City schools between $105 and $185 million annually, though some of these savings would be offset by the *922 greater cost of instructing children with special education needs in a mainstream environment (187 Mise 2d at 96-97). The Appellate Division saw the possible savings mounting to “hundreds of millions of dollars, if not $1 billion” (295 AD2d at 17) — a figure exceeding even the $335 million claimed by the State’s expert, Dr. Daniel Reschly.
We are thus constrained to accept that some saving on special education is possible, a fact that to some extent undermines plaintiffs’ argument that the school funding system is unconstitutional because it leaves New York City schools with insufficient funds to provide a sound basic education. But the magnitude of the savings is in dispute. The Appellate Division appears to have arrived at its “billion” simply by taking the number of full-time special education students, assuming that 80% could be moved to part-time settings, and multiplying the number of students subject to this move by the $10,000 difference between the cost of full-time and part-time placement. No witness for the State sponsored any such calculation, and there was thus no opportunity to test the Appellate Division’s assumptions on which it is based.
The available evidence-based conclusions are that overreferral to special education costs City schools somewhere between tens of millions and $335 million. Even the lower of these figures would reflect both resources squandered and the likelihood that many children are badly served and perhaps stigmatized by segregated placements in the special education system in City schools. But, conversely, even savings approaching the higher figure would not necessarily translate dollar-for-dollar into funds free for investment in better inputs, much less into an investment sufficient to relieve the existing systemic educational crisis. In any event, the State points us to no evidence on how much of any savings on special education would be invested in more productive inputs in City schools.
We need not speculate further on the possible saving from special education placement, however, for the State’s argument on Board of Education mismanagement fails for a more basic reason. As the trial court and Appellate Division recognized (187 Misc 2d at 81-82; 295 AD2d at 18-19), both the Board of Education and the City are “creatures or agents of the State,” which delegated whatever authority over education they wield (City of New York v State of New York, 86 NY2d 286, 289-290 [1995]). Thus, the State remains responsible when the failures of its agents sabotage the measures by which it secures for its citizens their constitutionally-mandated rights.
*923 As our ensuing discussion of remedy shows, various reforms unrelated to financing — some already in the works — may be part of the package of legislative and administrative measures necessary to ensure a sound basic education to New York City schoolchildren. The requirement stated in CFE, however, was for plaintiffs to “establish a causal link between the present funding system and any proven failure” (86 NY2d at 318), not to eliminate any possibility that other causes contribute to that failure.
Moreover, in every instance where the State has relied on purported political or managerial failings of the City or the Board of Education, closer inspection of the details casts doubt on whether the City could eliminate the failing without the State’s help or would have developed the failing without the State’s involvement. The issue of special education is illustrative. The trial court held that “the primary causes of New York City’s overreferral and overplacement in restrictive settings are a lack of support services in general education and State aid incentives that tended until recently to encourage restrictive placements” (187 Mise 2d at 95). This conclusion is supported by the record and was not disturbed by the Appellate Division. Thus, the State cannot blame overreferral on the institutional culture of the Board of Education and City schools without acknowledging that this culture has evolved to its present condition partly in response to the funding system. At the very least, under CFE, this problem does not constitute a cause sufficiently independent from the State’s funding system to overcome plaintiffs’ case.
Similar reasoning disposes of the State’s argument that the Board of Education’s inefficient management of personnel is the supervening cause that, rather than the funding system, accounts for deficiencies in the teaching input. The State points to disturbing evidence that thousands of City schoolteachers do not teach; others teach under contracts that limit their classroom time to under four hours a day; and all are paid according to the same salary schedule, regardless of whether a more flexible system of incentives might be needed, for instance, to induce senior teachers to remain in troubled schools. The Appellate Division characterized such evidence as “the product of collective bargaining agreements, not the manner in which the State funds the City’s schools” (295 AD2d at 18). But as the trial court found, “the allegedly shorter workday of New York City’s public school teachers has not provided the City an advantage in the competition for qualified teachers” *924 (187 Misc 2d at 36). Such considerations, as well as the simple constitutional principle that the State has ultimate responsibility for the schools, counsel us against the State’s rebuttal arguments on causation.
Local Funding. Of the State’s rebuttal arguments, one more requires special attention. The State argues that the City actually has a greater capacity to fund education from local revenues than many local governments statewide, yet fails to make anything like the same “tax effort” that other localities make. Indeed, the State marshals evidence that when the State injects funds pursuant to formulas intended to compensate for inequalities in local school funding, the City deducts proportionately from its own contribution, leaving the school budget unimproved.
The trial court found evidence to support this assertion; noted unique pressures on the City budget and other factors that account for some of the difference in tax effort; and concluded that the ultimate responsibility to address this problem still lay with the State (187 Mise 2d at 97-99). The Appellate Division expressly rejected the State’s contention that “any inadequacy in funding is the fault of the City,” noting that “the State exerts extensive control over the City, including taxes that may be levied and debts that may be incurred,” but reflecting that the remedy, rather than “requiring the State to write out a check every time the City underfunds education” may be for the State to “require the City to maintain a certain level of education funding” (295 AD2d at 18, 19).
Here, therefore, there is next to no dispute. If the State believes that deficient City tax effort is a significant contributing cause to the underfunding of City schools, it is for the State — through a combination of enforcing existing laws such as the Stavisky-Goodman Law (Education Law § 2576 [5-a]) and new legislation — to consider corrective measures. This possibility pertains to the remedy, not to the definition of plaintiffs’ burden of proof on causation or — what amounts to the same thing in practice — to the determination of whether plaintiffs’ cause of action is viable..
In CFE Judge Simons argued otherwise, citing declining City contributions to the school budget as part of his reason why plaintiffs’ claim should have been dismissed (86 NY2d at 334, 340-341). The State essentially tries to revive this argument, contending that plaintiffs must lose because they have not shown why their grievance could not be addressed by *925 measures less drastic than constitutional adjudication: greater effort by the City, whether voluntary or statutory. The analysis we have already outlined regarding responsibility for special education placement and teacher employment practices applies here again. Relative to the State, the City has “absolutely no control” over the school funding system (City v State, 86 NY2d at 295) and while any failings may be considered in determining the remedy, they do not constitute a supervening cause sufficient to decide the case for the State. Plaintiffs have established the causation element of their claim.
V. The Remedy
Challenging as the previous issues are, in complexity they pale by comparison to the final question: remedy. Pointing to a long history of State inaction despite its knowledge of the inadequacy of the education finance system, plaintiffs ask us to initiate a legislative/judicial dialogue by issuing guidelines to the Legislature for restructuring the system and directing — with strict timetables — that the necessary resources be provided. The State, by contrast, urges that, should a constitutional violation be found, the Court simply direct the proper parties to eliminate the deficiencies.
Both extremes are problematic. We are, of course, mindful — as was the trial court — of the responsibility, underscored by the State, to defer to the Legislature in matters of policy-making, particularly in a matter so vital as education financing, which has as well a core element of local control. We have neither the authority, nor the ability, nor the will, to micromanage education financing. By the same token, in plaintiffs’ favor, it is the province of the Judicial branch to define, and safeguard, rights provided by the New York State Constitution, and order redress for violation of them. Surely there is a remedy more promising, and ultimately less entangling for the courts, than simply directing the parties to eliminate deficiencies, as the State would have us do.
The trial court ordered the State first to ascertain the actual cost of providing a sound basic education statewide, and then reform the system to (1) ensure that every school district has the resources necessary to provide a sound basic education; (2) take into account variations in local costs; (3) provide sustained and stable funding in order to promote long-term planning by school districts; (4) provide “as much transparency as possible so that the public may understand how the State distributes school aid”; and (5) ensure a system of accountability to mea *926 sure the effect of reforms implemented (187 Misc 2d at 115). We take it that the fourth, “transparency” requirement would relate to the process by which funds are allocated in Albany, while the fifth, “accountability” requirement relates to the evaluation of schools and of programs designed to improve them.
The State objects to each of these guidelines on various grounds, but a common theme is that existing reforms already address existing problems. Indeed, ongoing federal, state and City programs — several initiated after the close of trial — likely constitute the most ambitious education reform in recent years. Starting at the federal level, the No Child Left Behind Act of 2001 (Pub L 107-110, 115 US Stat 1425 [2002]), amending the Elementary and Secondary Education Act of 1965 (20 USC § 6301 et seq.), now requires states to establish mechanisms to identify schools where student performance does not meet standards set by each state. To qualify for federal education funding, states must give children who attend such schools remedial options, such as tutoring or the right to transfer to a better school.
As part of a statewide procedure to identify schools in need of improvement, a number of City schools have been designated as Schools Under Registration Review (SURR) (see 8 NYCRR 100.2 [p]). This SURR list consists of those schools the Commissioner of Education deems farthest from meeting accountability criteria tied to the Learning Standards (8 NYCRR 100.2 [p] [4], [7]). Such schools are required to implement a “corrective action plan” and undergo monitoring; if they do not improve, they may be declared “unsound” (8 NYCRR 100.2 [p] [5]). In New York City, some SURR schools are removed from their community school district and absorbed into a special “Chancellor’s District,” where they receive greater resources and supervision. City schools constituted 94 of the 98 SURR schools statewide in 1997-1998, the last year for which the record discloses the number of SURR schools.
In addition to federal and state measures directed at identifying and improving bad schools, significant legislation reorganizing City school governance has been passed since the trial (see L 2002, ch 91; cf. L 2003, chs 6, 15). The legislation enhances the powers and duties of the Mayor of New York City and persons accountable to the Mayor — notably the Chancellor — to manage school finances and the School Construction Authority, and select and supervise district superintendents and other staff (see Mem of Legis Rep of City of NY, 2002 McKinney’s Session Laws of NY, at 1718-1719).
*927 Further, through an ongoing process of reform, the Regents have sought to reduce the employment of uncertified teachers and fortify the requirements for certification (see e.g. 8 NYCRR 80-3.4, 80-5.10 Q]). Likewise, regulations adopted with the Learning Standards and intended to improve the rigor of instruction statewide are close to being fully phased in; for instance, students who entered ninth grade in the 2001-2002 school year no longer had the option to take a “local diploma” (see 8 NYCRR 100.5).
All of these initiatives promise, but await, demonstrable outcomes. We are, of course, bound to decide this case on the record before us and cannot conjecture about the possible effect of pending reforms, at least when determining whether, on the evidence gathered over four years and presented during the seven-month trial, a constitutional violation exists. To the extent that recent reforms enable more students to receive a sound basic education, the State will have the opportunity on remittal to present evidence of such developments.
For similar reasons, we cannot join the dissent in attaching significance to state budget figures showing that in 2002-2003, “the City enrolled 37% of the State’s public school population and was allocated 37% of the combined major aid enacted” (dissenting op at 955). Presumably the dissent cites this figure as proof that any inequalities in the funding system have been remedied since trial. But under Levittown and CFE, plaintiffs have a right not to equal state funding but to schools that provide the opportunity for a sound basic education.
Aside from this, even assuming the 2002-2003 figures — which were not part of the record — were properly before us, the dissent misstates their significance. They are based on total aid-able pupil units (TAPU) (Education Law § 3602 [8] [ii]) and thus would demonstrate not that the City’s funding share equaled its enrollment share, but that its funding share equaled its attendance share — a significant difference given evidence that City schools are beset by truancy. Further, the figures do not reflect STAR tax relief, a $2.7 billion program in the year on which the dissent has focused (see New York State Division of the Budget, Education Unit, Description of 2002-03 New York State School Aid Programs, at 30, table II-B). STAR enables homeowners to pay lower property taxes to fund the school system, and enables districts to make up the difference with state funds (see Education Law § 3609-e; RPTL 425). As the trial court said, “New York City receives less STAR aid than localities in the rest of the State” (187 Mise 2d at 86). *928 Finally, of course, the record reflects that a dollar does not go so far in New York City as it goes elsewhere in the State. Thus, even if interdistrict equality were the issue, the 2002-2003 figure cited by the dissent would be far from decisive. We do not explore this point to discredit any choices the Legislature may have made in recent budgets to increase the City’s relative allocation of state aid, but simply to emphasize why we focus on record facts whose significance has been properly tested in litigation.
Given all of the jurisprudential constraints discussed above, we begin our review of the trial court’s directives by rejecting the provision that the remedy be statewide, and that variations in local costs be taken into account. Courts deal with actual cases and controversies, not abstract global issues, and fashion their directives based on the proof before them. Here the case presented to us, and consequently the remedy, is limited to the adequacy of education financing for the New York City public schools, though the State may of course address statewide issues if it chooses.
Second, we recognize that mechanisms in place, including No Child Left Behind and the SURE process, may already to some extent function as a system of accountability. They are not foolproof, and neither is tied to the definition of a sound basic education. Nevertheless, the State should be able to build on existing criteria to identify the schools in greatest need and set measurable goals for their improvement.
Third, we are not prepared to say as a constitutional matter that a new system must ensure the City “sustained and stable funding.” The language of this directive may appear unobjectionable, but in the context of the trial court’s decision it implies a need for fundamental change in the relationship between New York City schools and their local tax base. The school districts in New York City, Buffalo, Yonkers, Syracuse and Rochester — unlike every other district in the State — are “fiscally dependent”: they lack the authority to levy property taxes to support education.[9] As the trial court observed, City schools are dependent on municipal revenues, largely from other kinds of taxes more susceptible to the vagaries of the business cycle (187 Misc 2d at 98). It may well be that this susceptibility hinders City schools from developing a more stable budgetary plan — and that any plan to improve City *929 schools that required better local tax effort, in particular, would need to address this matter. At the same time, the State has suggested that reforms tending to concentrate responsibility with the Mayor of New York City may prove beneficial, and we do not know that a “sustained and stable funding” requirement addressing fiscal dependency would necessarily fit together with such reforms. Accordingly, while the trial court’s directive is understandable, we do not make it mandatory.
Fourth, as the foregoing implies, the trial court properly indicated that reforms may address governance as well as the school funding system. Various factors alleged by the State as causes of deficiencies in the schools — and rejected by us on the ground that the State has ultimate responsibility for the conduct of its agents and the quality of education in New York City public schools — may be addressed legislatively or administratively as part of the remedy. We do not think such measures will obviate the need for changes to the funding system, but they may affect the scope of such changes.
Finally, we know of no practical way to determine whether members of the political branches have complied with an order that the funding process become as transparent as possible, and we therefore decline to incorporate such a directive into our order. No one, however, disputes the trial court’s description of the existing education funding scheme as needlessly complex, malleable and not designed to align funding with need (187 Mise 2d at 82-90). The causes are worth considering.
As Levittown indicates, the justification for a school funding system based on local taxation is “the preservation and promotion of local control of education” (57 NY2d at 44). Conversely, the purposes of state aid to schools are, according to the SED, to assist school districts in providing an effective education; maintain a state-local partnership in public education; equalize school revenues by providing state aid in inverse proportion to each school district’s ability to raise local revenues; and encourage model programs to address the needs of the school community. Clearly these purposes reflect a recognition that inputs should be calibrated to student need and hence that state aid should increase where need is high and local ability to pay is low.
In the case of New York City, student need is high, as is the local ability to pay, as measured by the State’s Combined Wealth Ratio. Thus, as the trial court observed, the equalizing elements of the state aid formula do not operate to the *930 advantage of City students, the more so in that the system does not take into account the high cost of running schools in the City (187 Mise 2d at 85-86). And the record supports the trial court’s conclusion that funding components that might channel funds to meet the needs of City students fail to make a difference in the end: New York City regularly receives a fixed share — -just under 39% — of any funding increase (187 Mise 2d at 89).
Thus, the political process allocates to City schools a share of state aid that does not bear a perceptible relation to the needs of City students. While we do not join the trial court in ordering that the process be made as transparent as possible, we do agree that the funding level necessary to provide City students with the opportunity for a sound basic education is an ascertainable starting point. Once the necessary funding level is determined, the question will be whether the inputs and outputs improve to a constitutionally acceptable level. Other questions about the process — such as how open it is and how the burden is distributed between the State and City — are matters for the Legislature desiring to enact good laws.
In view of the alternatives that the parties have presented, we modify the trial court’s threshold guideline that the State ascertain “the actual costs of providing a sound basic education in districts around the State” (187 Mise 2d at 115). The State need only ascertain the actual cost of providing a sound basic education in New York City.[10] Reforms to the current system of financing school funding and managing schools should address the shortcomings of the current system by ensuring, as a part of that process, that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education. Finally, the new scheme should ensure a system of accountability to measure whether the reforms actually provide the opportunity for a sound basic education.
The process of determining the actual cost of providing a sound basic education in New York City and enacting appropriate reforms naturally cannot be completed overnight, and we therefore recognize that defendants should have until July 30, 2004 to implement the necessary measures.
*931 VI. Conclusion
We offer these concluding thoughts, against the backdrop of the dissent.
Courts are, of course, well suited to adjudicate civil and criminal cases and extrapolate legislative intent (dissenting op at 959). They are, however, also well suited to interpret and safeguard constitutional rights and review challenged acts of our co-equal branches of government — not in order to make policy but in order to assure the protection of constitutional rights. That is what we have been called upon to do by litigants seeking to enforce the State Constitution’s Education Article. The task began with Levittown’s articulation of the constitutional right to a sound basic education — not at all a “catchphrase for an inferred constitutional guarantee” (dissenting op at 948-949), but this Court’s careful judgment 21 years ago as to what is meant by our State Constitution’s promise in the Education Article. CFE built on our definition of the constitutional requirement, adding to the law a determination that the complaint stated a cause of action, and that — if plaintiffs proved their assertions, as they have — they would establish a violation.
Nor is the Court’s standard of a sound basic education, articulated both in Levittown and CFE, “illusory” for failing to fix the moment when a meaningful high school education is achieved (dissenting op at 948-954). As the dissent itself exemplifies by “of course” rejecting the eighth (or ninth) grade test of the Appellate Division and offering no other, a constitutional standard of sound basic education need not pinpoint a date with statutory precision, so long as it defines the contours of the requirement, against which the facts of a case may then be measured.[11] Indeed, a sound basic education back in 1894, when the Education Article was added, may well have consisted of an eighth or ninth grade education, which we unanimously reject. The definition of a sound basic education must serve the future as well as the case now before us.
Finally, the remedy is hardly extraordinary or unprecedented (dissenting op at 958). It is, rather, an effort to learn from our national experience and fashion an outcome that will address the constitutional violation instead of inviting decades of litigation. A case in point is the experience of our neighbor, the *932 New Jersey Supreme Court, which in its landmark education decision 30 years ago simply specified the constitutional deficiencies, beginning more than a dozen trips to the court (dissenting op at 958 n 11), a process that led over time to more focused directives by that court (compare Robinson v Cahill, 63 NJ 196, 198, 306 A2d 65, 66 [1973] with Abbott v Burke, 119 NJ 287, 385-391, 575 A2d 359, 408-411 [1990]). In other jurisdictions, the process has generated considerably less litigation, possibly because courts there initially oifered more detailed remedial directions, as we do (see e.g. Rose v Council for Better Educ., Inc., 790 SW2d 186, 215-216 [Ky 1989]). We do not share the dissent’s belief that in New York any constitutional ruling adverse to the present scheme will inevitably be met with the kind of sustained legislative resistance that may have occurred elsewhere.
Nor is it certain that plaintiffs’ success will necessarily inspire a host of imitators throughout the state (dissenting op at 956). Plaintiffs have prevailed here owing to a unique combination of circumstances: New York City schools have the most student need in the state and the highest local costs yet receive some of the lowest per-student funding and have some of the worst results. Plaintiffs in other districts who cannot demonstrate a similar combination may find tougher going in the courts.
We trust that fixing a few signposts in the road yet to be traveled by the parties will shorten the already arduous journey and help to achieve the hoped-for remedy.
Accordingly, the order of the Appellate Division should be modified and the case remitted to Supreme Court for further proceedings in accordance with this opinion, and as so modified affirmed, with costs to plaintiffs.

. After the Appellate Division’s decision, the United States Supreme Court decided Gonzaga Univ. v Doe (536 US 273 [2002]). Though not a title VI case, Gonzaga reinforces the conclusion the Appellate Division correctly drew from various federal circuit court decisions: that where a statute does not clearly and unambiguously create an implied private right of action, it also does not create rights enforceable under 42 USC § 1983. Plaintiffs’ only argument to distinguish their case from Sandoval was that they brought their disparate impact claim under section 1983, but Gonzaga shows that this distinction is unavailing, as is plaintiffs’ further attempt to distinguish Gonzaga.

. The composition of the Board of Education and its responsibilities and the Chancellor’s have changed substantially since trial (see L 2002, ch 91, §§ 6,11,12). We are, of course, bound by the record, which has been subjected to adversarial scrutiny, and do not consider posttrial factual materials.

. By contrast, the State argues that by showing that the outputs are good enough — in particular, that City schoolchildren perform satisfactorily on certain standardized tests — it has obviated inquiry regarding the inputs. The State reasons that many children come to City schools with socioeconomic and cultural backgrounds that put them at risk of academic failure, as the evidence confirms. Therefore, the State continues, while the City schools cannot necessarily be blamed for bad results, they surely should receive full credit for any good results. Indeed they should. But the outputs here do not support a judgment for the State.
While the State urges an affirmance based on what it considers good outputs, the dissent — relying on Paynter — suggests that there is something “inconsistent” about even discussing them (dissenting op at 952 n 5). Paynter holds that proof of inadequate inputs is necessary for an Education Article claim, not that such proof is sufficient for such a claim. Thus, our discussion of outputs is consistent with both Paynter and CFE — which contemplated cautious use of output evidence — as well as responsive to an argument the State made.

. Some facts that the trial court classified as purely “physical” facilities inputs are inseparable from overcrowding and excessive class size — conditions whose measurable effect on students plaintiffs have shown. One symptom of an overcrowded school system is the encroachment of ordinary classroom activities into what would otherwise be specialized spaces: libraries, laboratories, auditoriums and the like. There was considerable evidence of a shortage of such spaces. Particularly poignant is the fact that 31 New York City high schools serving more than 16,000 students have no science laboratory whatsoever. Whether this fact stems from overcrowding or from the design of some old school buildings, its direct impact on pedagogy is self-evident and it counts against the State in any assessment of the facilities input.

. The counterexample the Appellate Division gives of the City’s Catholic schools, where students perform relatively well despite larger class sizes (295 AD2d at 11), is inapposite for various reasons, including the greater flexibility Catholic schools have in choosing, disciplining and expelling students.

. The dissent characterizes our holding as one under which “dropouts by definition do not receive a ‘meaningful high school education,’ ” so that “it logically follows that the recipient of a high school diploma is the only student who does” (dissenting op at 952, 952-953). But a presumption is not the same thing as a definition; it can be rebutted. The State, indeed, suggested that some students may drop out despite having received a sound basic education. But there is no evidence in the record to support the State’s suggestion. If, in fact, high school graduation standards are set exceedingly high, and students can generally make a satisfactory entry into the workplace without a diploma, the State will always be free to prove these facts.

. The evidence of Board of Education data tracking the high school classes of 1986 through 1996 is compelling that between a quarter and half of those students who drop out do so after completing four years of high school. Such students — motivated to take extra time, if necessary, to complete high school — still do not achieve this objective.

. The State challenged this very conclusion with the testimony of its sociology expert, Dr. David Armor — who performed statistical studies designed *920 to test the effect of increased educational inputs while controlling for socioeconomic differences among students. The State argued that these studies show no correlation between increased funding and increased teacher certification rates and, further, no correlation between increased certification rates and better student scores — but the trial court found Dr. Armor’s testimony “not persuasive” (187 Misc 2d at 71), a finding the Appellate Division did not contradict.

. The same cities have constitutional debt limits (see NY Const, art VIII, §4 et seq.).

. In issuing our directive to the State we recognize that it has fiscal governance over the entire State and that in a budgetary matter the Legislature must consider that any action it takes will directly or indirectly affect its other commitments.

. In fact the dissent, though it would affirm the Appellate Division order, identifies no holding of that Court that it considers the better rule of law than those we have set forth today.